KEVIN J. BURKE, Plaintiff-Appellee, *v.* ILLINOIS POWER COMPANY *et al.,* Defendants.—(FMC CORPORATION, Defendant-Appellant and Cross-Defendant-Appellant; LIBBY-OWENS-FORD COMPANY, Defendant-Appellant and Cross-Plaintiff-Appellee; ILLINOIS POWER COMPANY, Defendant-Appellant, Cross-Defendant-Appellant and Third-Party Plaintiff-Appellant; METROPOLITAN SANITARY DISTRICT OF GREATER CHICAGO, Third-Party Defendant-Appellee and Cross-Plaintiff-Appellee.)

First District (3rd Division)    No. 59549

Opinion filed January 18, 1978.—Rehearing denied March 27, 1978.

500

James B. O'Shaughnessy and David Cook, both of Schiff, Hardin and Waite, of Chicago, for appellant Illinois Power Company.

Menk, Johnson & Bishop, of Chicago (John Cadwalader Menk, of counsel), for appellant FMC Corporation.

Lord, Bissell & Brook, of Chicago (C. Roy Peterson, Richard E. Mueller, and Hugh C. Giffin, of counsel), for appellant Libby-Owens-Ford Company.

Bradley, Eaton, Jackman & McGovern, of Chicago (Joseph V. McGovern and Warren J. Marwedel, of counsel), for appellee Metropolitan Sanitary District of Greater Chicago.

Louis G. Davidson and Peter F. Ferracuti, both of Chicago (William J. Harte and Robert B. Patterson, of counsel), for appellee Kevin J. Burke.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

On July 20, 1970, plaintiff Kevin Burke sustained crippling injuries when the boom of a crane under which he was working contacted live overhead electrical wires. Plaintiff was employed at the time as a laborer for the Metropolitan Sanitary District of Greater Chicago (hereinafter "the sanitary district.") Plaintiff sued to recover damages for the injuries against three defendants: Illinois Power Company (hereinafter "the power company"), which owned and maintained the power lines on a negligence theory; FMC Corporation, the crane manufacturer on a strict products liability theory; and Libby-Owens-Ford Company (hereinafter "LOF"), alleging violation of the Structural Work Act. Following a jury trial, plaintiff recovered a verdict against all three defendants for $2,500,000.

A number of cross actions and third-party actions also were decided. The power company had sued the sanitary district on a theory of common law indemnity. The latter sued FMC on the same theory. FMC brought indemnity actions against LOF and the sanitary district. LOF had

sued FMC and the power company, also on an indemnity theory. The trial court directed verdicts in favor of the sanitary district on its cross-claim against FMC as well as on FMC's action against the sanitary district, and in favor of LOF on its cross-claim against FMC. The jury rendered verdicts in favor of LOF on its cross-claim against the power company and in favor of the sanitary district on the power company's third-party action. The jury answered several special interrogatories and made specific findings that the power company had been actively negligent while the sanitary district had been passively negligent. The trial court entered judgments in accordance with the verdicts.

The three defendants appeal from the judgment entered in favor of plaintiff. The power company also appeals from the adverse judgment in its third-party action against the sanitary district and from the judgment for LOF in its cross-claim against the power company. FMC appeals from the judgments against it rendered in favor of LOF and the sanitary district.

The site of the accident, known as the Blackhawk Beach Project, was owned by LOF and was located adjacent to Route 71, a highway near Ottawa, Illinois. It was on the south bank of the Illinois River. On the other side of the river, LOF owned a glass manufacturing plant which produced large amounts of waste material known as silica dust, a fine micron-sized, sand substance. This substance was piped under the river and dumped into lagoons located on approximately 73 acres of the project site. Between the lagoons and the highway was an eight-foot cyclone fence with east and west gates. LOF and the power company had keys to the gates and, during the project, the sanitary district also had keys.

The silica dust which filled the lagoons created a problem for LOF. When the dust dried, it was blown about by the wind causing discomfort to neighbors. In 1969 an LOF employee learned of the sanitary district's use of a processed waste called sludge in reclaiming soil. After an unsuccessful preliminary test, the sanitary district eventually demonstrated to LOF that the conversion was feasible. The two parties thereupon agreed to the reclamation project on a large scale.

The sludge was to be shipped on the river to the site by barge. A pipeline system was constructed between the dock and the lagoons consisting of heavy steel pipe 16 inches in diameter and 20 feet long. The pipe was laid under the highway through an LOF spillway to a manifold which accommodated the four-inch aluminum pipe system laid throughout the lagoon area to distribute the sludge.

Since 1942 the power company had owned and maintained electrical lines on this land pursuant to an easement granted by LOF's predecessor in title. Twelve thousand volt (12kv) lines carried on poles stretch east and west a few feet south of the highway. A telephone line was carried on

these poles beneath the electrical lines. Pole 62, the corner pole at the east gate, carried a single three phase electrical line known as line 3403. This was a 34,500 volt line which extended south from the east gate between two lagoons. It was 35 feet above the ground and was the line which was struck by the boom of the crane.

The crane involved in the accident was utilized in constructing the pipeline and remained on the site throughout the entire project. Sludge was delivered from November 1969 until May 1970. After delivery of the sludge to the project was completed, the sanitary district, on July 13, 1970, began dismantling the pipeline. This task was carried out by sanitary district employees. Only two LOF employees were connected with the project. One was concerned with pollution and environmental aspects; the other LOF employee was responsible for engineering aspects.

On July 20, 1970, the sanitary district employees by use of the crane were to load the 16-inch pipes onto a flatbed truck bound for Chicago. The sections of pipe were to be lifted individually by the crane over the cyclone fence onto the truck on the other side of the fence. Eight sanitary district employees were present: a supervisor, crane operator, a truck driver, three pipefitters and two laborers. Richard Gallimore, who had been in charge of the project, was not present during July. Gerald Woodward, a pipefitter who had acted as a signalman during the previous week, also was absent. John Casey, the crane operator with 10 years' experience, testified that the crane had been difficult to start that morning. The crane eventually was started and the first lift occurred at 9 a.m. As the pipe was lifted toward the fence, three men guided it by holding onto an end and walking it. Casey raised the boom from its initial 40-degree angle from the ground to a 70-degree angle so as to clear the fence. The boom either touched line 3403 or came in close enough proximity to it that electricity surged down into the steel pipe. A ball of flame shot out of one end killing the pipefitter guiding that end. The two laborers who were guiding the other end of the pipe, plaintiff and Robert Boaz, suffered severe injuries from their contact with the pipe.

When the electrical jolt and the flash hit the plaintiff, he immediately fell to the ground in a semiconscious state, with his body shaking and jumping off of the ground. He was frothing at the mouth, ears, eyes and nose and his body was violently convulsing. His eyes were described as appearing to be "coming out of his head." Plaintiff's steel rimmed glasses had burned a hole through his nose from one eye to the other. Shortly thereafter, when plaintiff began to regain consciousness, he attempted to get up but was unable to move either his hands or feet. His hands were bent down with the skin peeled all the way down to the fingernails. His clothes and body were badly burned and he began screaming continuously as a result of the excruciating pain.

An ambulance was summoned which transported the charred body to

Ryburn Community Hospital where plaintiff was immediately given an IV narcotic to relieve his intense pain. Plaintiff was alert and cooperative even though his injuries were extensive. He had superficial burns on the facial area, third degree burns on the anterior chest, a third degree burn of the left elbow, and a right hand which had been so completely burned from the wrist downward that it had no feeling. He was unable to move these fingers. Both feet were hot and severely burned, with a massive tissue loss including most of the toes. Plaintiff received emergency treatment, and by the next morning his feet had cooled although they and his right hand remained avascular.

Plaintiff was transferred to the Cook County Burn Unit the day after the accident where he remained for over four months until early December 1970. He received antibiotic treatment and the doctors attempted to save his burned limbs. Eight days after his arrival, it became necessary to amputate his right hand and forearm. The first week of August both legs were amputated as well and on August 21 the stumps were closed with some skin grafting of the other burned areas of the body. His left elbow had been burned badly enough to expose the bone into the joint. The attending physicians attempted to repair the damage through plastic surgery and full thickness skin grafts requiring a number of operations. In early August, the plaintiff underwent an extensive debridement of his elbow and on September 17 a skin graft was performed. Throughout his hospitalization, plaintiff required dressing changes on each extremity two or three times daily which took two to three hours to accomplish. Plaintiff was in considerable pain which could not be completely relieved by narcotics. Sedation was regulated to prevent addition to the drugs.

As a result of the accident, plaintiff required four operations to remove cataracts from each eye rendering him industrially blind. He must wear thick corrective glasses and cannot use contact lenses since he cannot control them with his hooked prosthetic right hand. A year after the accident all of his teeth had to be extracted because of the difficulty of dental hygiene while hospitalized. Burke uses prosthetic legs, but after 10 minutes of use develops pains in the stumps. The stumps ache, ulcerate and drain occasionally. He understandably has considerable trouble in negotiating wet or uneven surfaces and cannot get up under his own power having fallen on a wet surface. He also has a prosthetic right hand and arm, but has difficulty in holding cups or in performing simple tasks.

At the time of the accident, plaintiff was married and the father of one daughter. The marriage since has terminated. Following his army discharge and education, he became a laborer earning approximately $9000 in 1969. Plaintiff will require medical care for the fitting and maintenance of his prosthetic devices and for skin breakdown and

irritation for the remainder of his life. The devices must be replaced every five years. Plaintiff has been unable to find employment.

The trial covered three months, and the parties presented over 50 witnesses. We will attempt to highlight the testimony essential to an understanding of the issues.

Power company employees testified that it was company policy to report any sightings of cranes working near or under power lines and to warn of the potential danger of coming into contact with those lines. The power company phased out foot patrol of its lines in the 1960's and relied upon monthly aerial surveillance of its transmission lines. Power company aircraft and vehicles were equipped with radios; employees were instructed to report promptly any situations which could be deemed hazardous. The employees also were told to stop and warn anyone involved in the hazardous situation because the average layman could not tell a telephone line from a high-voltage line. Between 1962 and 1970, the power company received reports of 12 accidents in which a crane boom contacted its transmission lines. One of its pilots testified that he reported between 10 to 20 sightings of cranes working dangerously close to the power lines each year.

A number of power company employees testified that they had seen the crane working near power lines at the Blackhawk Beach Project prior to this accident. Robert Hunter, an aerial surveillance pilot, filed an official report in September 1969 that a crane was working in the vicinity of line 3403 between poles 60 and 61. This report was found in the power company's files, but Hunter's supervisors stated that they had not received the report and therefore no action was taken on it. Hunter again observed the crane two months later. Larry Caulder, a serviceman for the power company, testified that three days before the accident he had observed the crane as he drove by on a service call. Although he thought he should stop and warn the workmen, he did not report his observation to the power company. Caulder's vehicle was equipped with a two-way radio and he had a key to the east gate. John Messaglia, the power company's district manager, did stop in the fall of 1969 when he saw the crane close to the lower 12 kv line. He informed an unidentified man that the line was energized. He did not warn the man of the dangers of line 3403, did not disclose precautions the power company could have taken, and did not report the incident to the power company. Earl Lasco, a forester with the power company, reported the crane's position either to co-employees or to a supervisor. It appeared to Lasco that the crane's position was already known to the supervisors because the subject of the crane came up at subsequent safety meetings. Lasco made no further report and gave no warnings to sanitary district employees.

Power company witnesses testified that line 3403 could have been de-energized in 30 minutes, and then the line could have been raised to a higher elevation. This procedure was fairly simple and inexpensive and had been followed by other contractors in the area. Eight foot fiberglass insulators could have been placed upon the wires. Although normally used only for line repairmen, the insulators were stored close to the project. While warning signs were also stored nearby, pole 62 contained no warning signs. Line 3403 originally had been designed to carry a heavier current load and was 35 feet above the ground at the point of contact with the crane.

The sanitary district employees testified that they were aware of the power lines and the danger of working in their vicinity. They did not believe that the crane boom could reach the lines. The boom could have been shortened to 20 feet. The sanitary district employees were not certain that the lines were energized or, if so, what voltage they were. They were also unaware that with little difficulty the lines could have been de-energized, rerouted, or insulated.

Considerable testimony was introduced concerning the crane involved and devices which purportedly could have been attached to it. According to plaintiff, the devices would have made the crane safer and would have avoided the accident. According to FMC, the devices would have converted the crane into a safety trap by inducing workers to rely on devices that were by no means failsafe. The crane was manufactured and sold by a division of FMC in 1957. FMC officers were aware of the hazards of cranes working in the vicinity of power lines. The only warning of this hazard was in the operator's manual which was in a compartment in the cab of the crane. The crane operator had to trust his own judgment or that of a person below when working around electrical wires. Witnesses offered by the power company and by FMC agreed that it is difficult to precisely judge the distance between the tip of the boom and the wires when looking up into the sky.

FMC officers testified that they had been aware of devices which could have been attached to the boom and which had been in existence for some time. The three devices mentioned at trial were a proximity warning device, which is electrical and sounds an alarm when within a certain preset distance from a power line; an insulated boom cage, which is an insulated metal framework which would have broken the flow of current from the wires through the crane's boom to the pipe below; and an insulated or "dialectic" link, which is circular and is placed on the lifting cable above the lifting hook affording protection against up to 75,000 volts. Testimony was offered both in favor of and against these devices. Robert Jenkins, Director of Safety for the Army Corps of Engineers from 1948 to 1964, testified that the army had used these safety

devices during his term as director. No accidents were reported during that time involving men on the ground when the devices were being utilized. FMC witnesses did not believe that the devices contributed to safety. FMC's engineering evaluation of the devices consisted primarily of accumulating and filing manufacturers' literature, and FMC had never tested them to determine their effectiveness.

As against plaintiff, the power company contends on appeal that plaintiff failed to prove his own due care; that plaintiff's four charges of negligence were not supported by sufficient evidence and were improperly submitted to the jury; that the intervening negligence of the sanitary district employees negated the power company's responsibility and was the sole proximate cause of plaintiff's injuries; that the exclusion of certain evidence constituted reversible error; and that the judgment of $2,500,000 entered in favor of plaintiff was excessive.

The power company initially argues that plaintiff did not prove that he exercised due care for his own safety and thus was guilty of contributory negligence.

If the record is barren of evidence of due care on the part of plaintiff, contributory negligence exists as a matter of law. (*Overman v. Illinois Central R.R. Co.* (1962), 34 Ill. App. 2d 30, 180 N.E.2d 213.) However as the power company's cited case establishes, "[w]here the plaintiff's due care cannot be established by direct testimony, it may be inferred by the jury from all of the facts and circumstances shown to exist prior to and at the time of the [occurrence]." *Mueller v. Sangamo Construction Co.* (1974), 20 Ill. App. 3d 602, 605, 314 N.E.2d 700.

■■ In the present case, due care, if present, must be inferred. The plaintiff suffered retrograde amnesia regarding the accident as a result of the severe electrical shock which he experienced. While plaintiff was aware of the danger of electrical transmission lines and of the existence of lines above the fence, it is not apparent that he regarded them as a hazard. The power company's own witnesses testified as to the difficulty a layman would have in judging the distance of a power line from the ground and of the need to warn laymen of the hazard. It is reasonable to infer that plaintiff believed that the boom could not reach the lines and that there was no hazard. This is especially credible because the more experienced workers on the scene failed to appreciate the full danger. At the time of contact, plaintiff was guiding a heavy pipe while walking over rough terrain. He was performing his function in such a manner that in no way contributed to the accident. The issue of plaintiff's due care was properly submitted to the jury, and the jury's decision on this point must stand.

The power company next contends that none of plaintiff's four allegations of negligence against it was supported by sufficient evidence and were improperly given to the jury. The four charges were: that the

power company failed to raise or relocate its line; that it failed to warn of the hazard and to inform of ways to reduce the danger; failed to de-energize the lines; and failed to properly insulate line 3403.

■■ It can be stated generally that the distribution of electrical energy is an extremely hazardous enterprise and a high degree of care is imposed on companies so engaged. Power companies also have the duty to take whatever steps are necessary and feasible to remedy known hazardous conditions. (*McGill v. Illinois Power Co., Inc.* (1959), 18 Ill. 2d 242, 163 N.E.2d 454.) More particularly, the plaintiff adduced evidence to support each charge of negligence alleged against the power company. The power company on the other hand offered evidence that relocation, de-energization, and insulation of its lines were unfeasible, unwise, and were unwarranted by the costs. Whether the various possible courses of action available to the power company were feasible and would have prevented the accident were questions for the trier of facts. The charges of negligence properly were submitted to the jury.

■■ The power company next argues that the actions of the sanitary district and its employees acted as an intervening cause and completely negated the power company's liability for the accident. However, the subsequent independent act, in order to break the causal connection, must be one the intervention of which was not probable or foreseeable by the first wrongdoer. (See *Neering v. Illinois Central R.R. Co.* (1943) 383 Ill. 366, 50 N.E.2d 497; Prosser, Law of Torts §44 (4th ed. 1971).) In the present case, the power company knew that a crane was working near power lines and was well aware of the correspondent risks involved. Particularly in view of the number of crane-power line accidents in the area, it is reasonable to conclude that this accident was foreseeable. The duty of the power company to warn or make safe should not be diluted. The breach of the power company's duty remains a proximate cause of the accident.

■■ The power company also urges that the trial court committed prejudicial and reversible error in the exclusion of certain evidence. The power company sought to introduce into evidence the Illinois Commerce Commission's General Order 160 which required that line 3403, since it carried a certain voltage and was located in a certain area, be at least 22 feet above the ground. Counsel for plaintiff, MSD, and LOF objected to its introduction, and the trial court sustained the objection. The evidence had revealed that the line was 35 feet above the ground at the point of contact with the crane. The power company wished to demonstrate that the line was 13 feet higher than the minimum requirement in order to prove lack of negligence on its part. In view of the power company's high degree of care owed, the relevance of the general order is questionable. In any event, its exclusion from evidence cannot be considered reversible

error. Counsel for the power company without objection discussed the I.C.C. general order both in his opening statement and closing argument, and informed the jury of the power company's compliance with the general order. Moreover, in this long and complex trial, the allegedly incorrect exclusion of this one piece of evidence could not have been so prejudicial to the power company as to warrant a new trial.

The power company, along with FMC, also contends that the verdict of $2,500,000 entered in favor of plaintiff is excessive. We do not agree. The injuries visited on plaintiff, the resulting amputations, the impairment of sight, the disability and disfigurement, the lasting pain and suffering, amply support the amount of the verdict. As the amount of damage generally is regarded as a question of fact for a properly instructed jury (*Lau v. West Towns Bus Co.* (1959), 16 Ill. 2d 442, 158 N.E.2d 63), we refrain from substituting our judgment for theirs.

The power company next argues that the trial court should have directed a verdict or entered judgment *n.o.v.* in its favor and against LOF since LOF could not be indemnified by the power company as a matter of law. The jury entered a verdict in favor of LOF on its cross-claim against the power company for indemnity.

The jury returned specific findings that the power company was actively negligent in this case. As previously indicated, the evidence supports this finding. LOF was found guilty of a violation of the Structural Work Act (Ill. Rev. Stat. 1973, ch. 48, par. 60 *et seq.*) which could only be classified as resulting from passive negligence on its part. The power company asks this court to carve out an exception to the law of indemnity in Illinois and to hold that an owner, found liable for a violation of the Structural Work Act, cannot look to a "stranger" for indemnity. The power company concedes that courts have allowed indemnity between two parties covered by the Act, including an owner looking to a contractor and a general contractor looking to a subcontractor. *Palier v. New City Iron Works* (1967), 81 Ill. App. 2d 1, 225 N.E.2d 67; *Wrobel v. Trapani* (1970), 129 Ill. App. 2d 306, 264 N.E.2d 240.

■■ The purpose of the Structural Work Act is to provide a safe area within which persons covered by the Act will be working. (Ill. Rev. Stat. 1973, ch. 48, par. 60.) One who creates or maintains a hazardous condition within the work area becomes liable to those persons injured therein. The power company, while not included within the auspices of the Act, attempts to rely on the Act as a shield against liability for its own negligence. It argues that the purpose of the Act would be defeated by diminution of the responsibilities created by the Act, of the strictures it demands, or of liabilities imposed for failure to comply. However the power company's reliance on the Act for protection is misplaced. The

power company created and maintained a dangerous condition near which the crane was working. It knew of the project, but took no steps to alleviate the hazard. Its knowledge of the danger was far superior to that of LOF. The Act's purpose would be defeated if indemnity is not allowed in such circumstances. Since the power company was actively negligent and LOF at worst passively negligent, the trial court could not properly have granted a directed verdict or a judgment *n.o.v.* for the power company. See *Mullins v. Crystal Lake Park District* (1970), 129 Ill. App. 2d 228, 262 N.E.2d 622.

The power company also requests a new trial against LOF because of the giving of certain instructions regarding indemnity. In light of our foregoing discussion of the law on the subject, we believe that the instructions were correctly given.

■■ The power company finally contends that the trial court erred in not granting it judgment *n.o.v.* after the jury's adverse verdict in its third party action against the sanitary district. The jury specifically found the power company to have been actively negligent. The sanitary district was found to have been passively negligent. As we have already discussed, ample evidence supports the jury's finding that the power company was actively negligent. Thus the power company as a tort-feasor guilty of active negligence is not entitled to indemnity from the sanitary district. Indemnity is not permitted in favor of a party guilty of active negligence regardless of whether the conduct of the party against whom indemnity is sought is active or passive. (*Carver v. Grossman* (1973), 55 Ill. 2d 507, 305 N.E.2d 161; *Doerge v. Wabash R.R. Co.* (1972), 4 Ill. App. 3d 914, 282 N.E.2d 226.) We therefore conclude that the judgment entered in favor of the sanitary district on the power company's third-party complaint was proper.

We next consider the issues raised by FMC, the manufacturer of the crane. FMC initially argues that the judgment entered in favor of plaintiff against it based on strict product liability was improper. For a plaintiff to recover on the basis of strict liability in Illinois, he must demonstrate that his injury resulted from a condition of the product; that the condition was an unreasonably dangerous one; and that the condition existed at the time it left the manufacturer's control. (*Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182.) In the present instance, the only question is whether the condition of the crane, absent safety devices, was an unreasonably dangerous one. FMC argues that because of the multifunctional nature of the crane it was unnecessary to provide the devices. It argues further that in any event the devices would act as "safety traps" and would not be in the best interests of those working on or around the crane.

It is undisputed that FMC had knowledge of the extreme hazards

involved when a crane is operated near high voltage electrical transmission lines. It was aware of past injuries to those working with a crane. FMC's officers testified that they had known of the devices since the early 1950's, but had not installed them or informed purchasers of their existence. Additionally, FMC never tested the devices nor had it engaged others to test them.

There is no concise definition of what constitutes an unreasonably dangerous condition. (See Restatement (Second) of Torts §402A (1964).) The question of whether a manufacturer must take various precautions so as not to produce an unreasonably dangerous product varies with the circumstances. The balancing of the likelihood and gravity of harm must be weighed against the burden of the precaution which would be effective to avoid the harm. (*Dunham v. Vaughan & Bushnell Manufacturing Co.* (1967), 86 Ill. App. 2d 315, 229 N.E.2d 684, *aff'd* (1969), 42 Ill. 2d 339, 247 N.E.2d 401.) Since the classification of a product as unreasonably dangerous is dependent on a variety of circumstances, it naturally falls upon a jury in most instances to make the determination as a matter of fact. *Mahoney v. Roper-Wright Manufacturing Co.* (7th Cir. 1973), 490 F.2d 229.; *Rivera v. Rockford Machine & Tool Co.* (1971), 1 Ill. App. 3d 641, 274 N.E.2d 828.

■■ At the very least, purchasers of the cranes should have been informed of the safety devices and advised of the danger of using the crane both with and without them. FMC's contention that the devices would act as safety traps and lull operators into carelessness because they would feel that the devices were foolproof was not borne out by the evidence. Jenkins' testimony revealed no accidents over a number of years while the devices were employed. No witness produced by any party at trial could cite one example of an accident occurring while a safety device was in use. Some States have even placed a nondelegable duty on a manufacturer to install a safety device on a product where it is unreasonably dangerous without that device. (*Bexiga v. Havir Manufacturing Corp.* (1972), 60 N.J. 402, 290 A.2d 281.) FMC's additional argument that because the crane is multifunctional, it will not always be working near power lines, and thus need not be equipped with electrical safety devices is not controlling. The same contention was dealt with by the court in *Rios v. Niagara Machine & Tool Works* (1974), 59 Ill. 2d 79, 319 N.E.2d 232. The court specifically stated that the multifunctional nature of a product is only one factor to consider in determining whether a product is unreasonably dangerous. The evidence amply supports a finding that FMC was liable to plaintiff under a strict product liability theory.

We next consider FMC's contention that the trial court erred in allowing the motions of the sanitary district and LOF to dismiss FMC's

cross-claims against them. Several recent Illinois cases have considered whether a defendant who has manufactured and sold an unreasonably dangerous product can seek indemnity from a subsequent user. In each case, the court has refused to allow such an action because of the basic policy underlying *Suvada*. (See *Burke v. Sky Climber, Inc.* (1973), 13 Ill. App. 3d 498, 301 N.E.2d 41, *aff'd* (1974), 57 Ill. 2d 542, 316 N.E.2d 516; *Stanfield v. Medalist Industries, Inc.* (1974), 17 Ill. App. 3d 996, 309 N.E.2d 104; *Kossifos v. Louden Machinery Co.* (1974), 22 Ill. App. 3d 587, 317 N.E.2d 749.) In *Stanfield*, the court, at page 1000, summarized the rationale behind this policy:

"It appears that the liability in these cases is qualitatively *active* so far as the seller or manufacturer is concerned and because of his unique relationship to the product as its creator, his negligence cannot be offset against that of a mere subsequent user. We conclude, therefore, that actions founded on strict liability for defective and unreasonably dangerous products are outside the active-passive theory of indemnity. Hence, third-party actions for indemnity against a subsequent user are not maintainable by the manufacturer or seller of the defective product."

As such, the court correctly dismissed FMC'c cross-claims.

FMC also argues that the trial court erred in not dismissing the cross-claims of the sanitary district and LOF for indemnity against FMC. These actions were filed on the intial day of trial and objected to by counsel for FMC as being untimely.

■■ Such matters are within the sound discretion of the trial judge. (*Nurnberger v. Warren & Van Praag, Inc.* (1971), 133 Ill. App. 2d 843, 272 N.E.2d 234.) Although the claims were filed on the first day of trial, FMC's defense was not prejudiced since it was substantially the same strict liability case as between FMC and plaintiff. In fact judgment on the cross-claims was not entered until the close of all the evidence and without the knowledge of the jury. The trial judge did not abuse his discretion in allowing the cross-claims to be filed.

As the propriety of the cross-claims, the case is similar to *Suvada* in that White Motors, the sub-purchaser who had settled with plaintiff Suvada, was indemnified by the manufacturer who had made the defective part. Here, LOF was found liable for its technical violation of the Structural Work Act and then went against the manufacturer of the unreasonably dangerous product on the theory of strict liability. An even closer case factually is that of *Texaco, Inc. v. McGrew Lumber Co.* (1969), 117 Ill. App. 2d 351, 254 N.E.2d 584. There, defendants, liable to a workman under the Structural Work Act, successfully sought indemnity from the supplier of the defective plank which caused the workman's injury. The sanitary district's situation is similar in that it was a user of a defective

product which resulted in the injury to plaintiff. The trial court correctly refused to dismiss the cross-claims of LOF and the sanitary district.

■■ We also believe that the trial court correctly directed a verdict in favor of LOF and the sanitary district against FMC following the jury's verdict on the strict liability issue. Although FMC alleges that triable issues of fact existed, it has failed to state any such issues. The reason for this failure is that the claims of LOF and the sanitary district are substantially identical to those of plaintiff in the strict liability portion of the case. FMC had an ample opportunity to state its case and to defend on the strict liability count against plaintiff.

■■■ FMC further contends that the trial court erred in striking its affirmative defenses of assumption of risk and misuse. Both have been held to be defenses to a strict liability claim. (*Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 261 N.E.2d 305.) These defenses were struck by the trial judge at the close of all the evidence; a similar earlier motion by plaintiff's counsel had been denied. Thus the trial court was presented with evidence on both defenses and concluded as a matter of law that plaintiff had neither assumed the risk nor misused the product. As the crane was being used in a clearly foreseeable and intended manner, the defense of misuse was not applicable. (*Walker v. Trico Manufacturing Co.*, (7th Cir. 1973), 487 F.2d 595; *Williams v. Brown Manufacturing Co.*) The test for assumption of risk fundamentally is a subjective one based on an assessment of the knowledge, understanding, and appreciation of the danger on the part of the party involved in the accident. (*Kinka v. Harley-Davidson Motor Co.* (1976), 36 Ill. App. 3d 752, 344 N.E.2d 655.) The evidence is overwhelming that plaintiff did not advance into a situation which he knew to be dangerous. The actions and testimony of plaintiff's fellow employees illustrate that they believed the crane would not contact the power lines. The evidence supported the trial court's determination that FMC had failed to prove its assumption of risk defense.

■■ FMC also maintains that the trial court committed prejudicial and reversible error in making certain adverse evidentiary rulings. FMC contends that the effect of these rulings was to deny its witnesses the opportunity of testifying to relevant information which they had concerning whether the safety devices were effective. FMC attempted to establish that because of shortcomings the devices were ineffective. FMC complains that four of its witnesses were barred from fully testifying as to the ineffectiveness of the safety devices. Three of the witnesses were past or present employees of FMC, none of whom were tendered or qualified as expert witnesses. The trial court consistently and correctly ruled that they could testify only to those matters within their own knowledge and experience. When they attempted to give an opinion based on

conversation and experiences of others, the court sustained plaintiff's objections. None of these witnesses had personally tested the safety devices nor had they worked with them. Otherwise, their testimony was complete.

FMC complains that it was denied the opportunity to cross-examine one of the witnesses regarding a standard for operating cranes near power lines which had been promulgated by the American National Standards Institute (ANSI). The trial court merely had ruled that this attempt was beyond the scope of plaintiff's examination under section 60 of the Civil Practice Act. FMC subsequently did not recall the witness to the stand to examine him on that point. Contrary to FMC's assertion, the pertinent standards of ANSI were read into the record and eventually utilized by counsel for FMC during the trial and in closing argument.

The fourth witness, Mr. Dale Marr, was qualified as an expert witness. As agreed to by counsel for FMC, Marr, prior to taking stand, was admonished by the trial judge to answer only the questions asked him. This caution was given because of his conduct during the taking of his deposition. Marr was allowed to testify fully, and gave his opinion as to why the safety devices were ineffective. In view of FMC's agreement to the admonishment to Marr, we cannot perceive how it could be considered as prejudicial error.

■■ FMC also complains that Mr. Richard Reimer, and employee of the National Safety Council, was improperly permitted to testify as to the presence of advertisements reflecting favorably on the quality of crane safety devices in the Council's newsletter. Plaintiff's counsel urged that this evidence was necessary to show that FMC had knowledge of the existence of safety devices. However, FMC had admitted that it was aware of the devices. The introduction of the testimony was error, but we view such cumulative testimony at worst as only harmless error. FMC also argues that it was restricted in its cross-examination of Reimer as to the content of the Council's Manual for Industrial Operations concerning a passage on safety devices. The ruling of the trial court was correct. Reimer had not been qualified to testify to such matters and obviously could not give his opinion thereon.

■■ FMC next argues that the introduction into evidence of the fact that subsequent to the accident warning decals were being installed in the cabs of FMC's cranes was improper. Although testimony of a post-occurrence change would be improper in a negligence action, FMC's liability was founded on strict liability. In strict liability cases such post-occurrence changes properly may be introduced into evidence. *Sutkowski v. Universal Marion Corp.* (1972), 5 Ill. App. 3d 313, 281 N.E.2d 749; *Mahoney v. Roper-Wright Manufacturing Co.*, (7th Cir. 1973), 490 F.2d 229.

FMC was not prejudiced when the trial court ruled that certain safety standards regarding cranes operating in the proximity of power lines voluntarily adhered to by the sanitary district could not be introduced into evidence. Although the sanitary district initially had listed the standards when asked for "safety standards followed by or applicable to" it in an interrogatory, the trial judge did not abuse his discretion in allowing the sanitary district to amend its answer to the interrogatory at the time of trial. In any event, the exclusion of the evidence could not have had an effect on FMC's adverse judgment in favor of plaintiff.

FMC, without pointing any specific error to this court, also claims error in the instructions. FMC thus waives argument on this point (*Flynn v. Vancil* (1968), 41 Ill. 2d 236, 242 N.E.2d 237; *Prather v. Lockwood* (1974), 19 Ill. App. 3d 146, 310 N.E.2d 815.) We have examined the instructions and find that when taken together they presented a fair and accurate statement of the law to the jury.

We finally consider LOF's appeal from the judgment in favor of plaintiff against it based on a violation of the Structural Work Act. LOF maintains that it did not violate the Act in that it was not in charge of the project; none of its employees were present or had knowledge of the actions which caused the accident; and the pipe system was neither a "viaduct" nor a "structure" and thus not covered by the Act. In the alternative LOF argues that it should be granted a new trial since the question of whether the pipeline was a structure was one of fact and should not have been decided as a matter of law by the trial court.

The primary purpose of the Act is to protect laborers in extra-hazardous work. An owner may be in violation of Act if he is in charge of the work and fails to provide a safe area within which the work proceeds. (Ill. Rev. Stat. 1973, ch. 48, pars. 60 and 69.) Mere ownership is insufficient for liability; an owner must be in charge of the work. (*Gannon v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.* (1961), 22 Ill. 2d 305, 175 N.E.2d 785; *Daniels v. Weiss* (1974), 17 Ill. App. 3d 294, 308 N.E.2d 46.) In *Larson v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 316, 211 N.E.2d 247, the court concluded that the term "having charge of" is one of common usage and understanding and that "* * * further attempt at definition can only lead to confusion and error."

■■ We believe that the jury had a sufficient factual basis to find that LOF was in charge of the project. It is uncontradicted that it retained the right to observe the work and terminate it at its discretion. While these are important elements of controlling the project, to be in charge of it requires that the owner's supervisory powers exceed the retention of these two basic rights. (*Melvin v. Thompson* (1963), 39 Ill. App. 2d 413, 188 N.E.2d 497.) Here, LOF kept control of the project through two of its employees, an engineer and an expert on pollution and environment.

Through these two men who spent considerable time at the project, LOF monitored the effect of the work on the surrounding environment. When it was discovered that sludge was leaking into the lagoon, LOF directed the sanitary district to build a wall or barrier to halt the flow. LOF also demanded that the pipeline go underneath the east and west gates, expressly stating that the pipeline must go underground. LOF was concerned with the distribution of the sludge and at least on one occasion directed the redistribution of the sludge. In view of the evidence that LOF supervised and coordinated the project, we uphold the jury's finding that it was in charge of the project. See *Rovekamp v. Central Construction Co.* (1964), 45 Ill. App. 2d 441, 195 N.E.2d 756.

LOF also contends that plaintiff did not prove a wilful violation of the Act as required to establish liability thereunder. (*Juliano v. Oravec* (1973), 53 Ill. 2d 566, 293 N.E.2d 897; *Miller v. DeWitt* (1967), 37 Ill. 2d 273, 226 N.E.2d 630.) LOF had knowledge of the use of the crane near the power lines. The crane had been used in similar operations before. LOF employees who were monitoring the project had been on hand at the time. As the employees knew of the danger and did nothing to alleviate the hazard, the jury was correct in finding LOF in wilful violation of the Act.

■■ LOF finally objects to the trial court having determined as a matter of law that the pipeline system was a "structure" within the meaning of section 1 of the Structural Work Act. (Ill. Rev. Stat. 1973, ch. 48, par. 60.) Recent cases have had to classify large, bulky equipment as falling within or without the ambits of section 1 which includes, "° ° ° any house, building, bridge, viaduct or other structure." In viewing this issue, we are reminded that a liberal construction should be afforded the Act so as to provide laborers in extra hazardous operations with a safe place to work. (*Navlyt v. Kalinich* (1970), 125 Ill. App. 2d 290, 260 N.E.2d 855, *aff'd* (1972), 53 Ill. 2d 137, 290 N.E.2d 219; *Louis v. Barenfanger* (1968), 39 Ill. 2d 445, 236 N.E.2d 724.) A mobile, self-propelled power shovel, although quite large, has been held not to be a "structure" within the meaning of the Act. (*Farley v. Marion Power Shovel Co.* (1975), 60 Ill. 2d 432, 328 N.E.2d 318.) In *Farley* the court expressed concern that the Act intended to limit inclusion to structures of the general type specified therein. The court was troubled that the definition would be expanded to include "other vehicles or items of personal property." However, the pipeline in the present case is considerably different from a mobile power shovel. Heavy steel pipes had been laid from the bank of the river, under the highway, through the LOF spillway, under the east gate access road, then on the surface mounted on wooden braces 1500 feet to the west. The pipeline again went underground beneath the west gate access road to the manifold system which was used to distribute the sludge. This system

extended throughout the 32-acre field containing the lagoon filled with the silica dust. Although the entire pipeline system was temporary, it was used for several months until it was dug up and hauled away through the use of workmen, trucks, and a crane. Such a system, buried partially underground and utilized for so long, was not what the court was concerned with when it mentioned the inclusion of other vehicles and personal property in *Farley*. The nature and extent of the construction is much closer to the sewer system held to be a structure within the Act in *Navlyt v. Kalinich* (1972), 53 Ill. 2d 137, 290 N.E.2d 219. As such, we agree with the trial court that the pipeline system as a matter of law was a structure within the meaning of the Act.

For the reasons stated, the judgments of the circuit court of Cook County are affirmed.

Judgments affirmed.

JIGANTI, P. J., and SIMON, J., concur.