ARMIDA CANTU, Adm'x of the Estate of Moises Cantu, Deceased, Plaintiff-Appellant, *v.* UTILITY DYNAMICS CORP., Defendant-Appellee.

First District (4th Division)   No. 77-1880

Opinion filed March 22, 1979.

Lane & Munday, of Chicago (Fred Lane and John Munday, of counsel), for appellant.

James J. O'Hagan and Victor J. Piekarski, both of Chicago, for appellee.

Mr. JUSTICE ROMITI delivered the opinion of the court:

The plaintiff in this case appeals from the granting of a summary judgment for the defendant who was sued for the negligent installation of

an electric wire, plaintiff's decedent having been electrocuted when scaffolding either touched or came near the wire. We agree with the plaintiff that issues of fact exist and reverse and remand for trial.

The accident occurred during the construction of the Fox Valley shopping center. Inland-Robbins Construction Company (Inland) was awarded the general contract for the construction of the Marshall Field building, the mall area and the site work, which included such items as water lines, sewer lines, parking lots and general landscaping. Ragnar Benson, the decedent's employer, was awarded the general contract for the construction of the Sears Building.

The construction work began in 1973. At that time Inland engaged the defendant, Utility Dynamics Corporation (Utility), to · erect a temporary electrical service, tapping onto the main Commonwealth Edison line, the line running in an east-west direction to the job site. Some months later, Ragnar Benson engaged Utility to install a second line (the Ragnar Benson line) from the east-west line to the Ragnar Benson staging area (office and storage area). While the line was to run generally from southwest to northeast, it had to be installed at an angle because there was a pond south of the staging area. At the time this second line was installed, there was no construction near the line; however, the line did run within 10 to 18 feet of the planned automotive center. At the time the line was installed the location of the automotive center was shown on blueprints which were available at the building site for inspection by anyone. According to Mr. Spencer, the president of Utility, the line was 28 feet above the ground.

This second line consisted of a bare, uninsulated 7200-volt wire. This wire was less expensive than normal 120-volt household service, although the latter would have served Ragnar Benson's needs equally well. According to Mr. Spencer, 120 volts would have been much safer; in fact, with that wire there was no risk.

On August 28, 1974, the decedent assisted a co-worker in moving scaffold towers which were approximately 27 feet in height to the automotive center. The towers were moved by lift truck. The decedent's job was to walk along the lift truck and hold the towers so that they did not fall from the truck. As the truck passed near the Ragnar Benson line, the tower either touched the line or the current arched over to the tower; Cantu was killed instantly. There was some deposition testimony indicating the tower had tilted because the ground was uneven.

The trial judge, after considering various affidavits and depositions, granted summary judgment to the defendant on the grounds that:

1. this was a provision of temporary electrical service;
2. all the standards of the code were followed at the time of the erection of the temporary service;

3. the location of the wire was really determined by Ragnar Benson not Utility.

On appeal, the defendant also urges that the judgment was proper because the decision as to the type of line to be used was made by Ragnar Benson; that Utility had no duty to maintain the line as the conditions of the site changed; that at the time it was installed, it was safe and it was not placed near any structure under construction. We find that these arguments are all part of one major issue: whether the defendant owed a nondelegable duty to the plaintiff or whether it could shift all of its responsibility to Ragnar Benson.

■■ In determining whether the defendant has carried its burden of showing that no issue of fact exists (*Leon v. Max E. Miller & Son, Inc.* (1974), 23 Ill. App. 3d 694, 320 N.E.2d 256, *appeal denied* (1975), 57 Ill. 2d 608), it is not necessary to set forth all of the deposition evidence. We will, however, set forth in the body of this opinion such additional factual information as is relevant without intending to suggest that only those facts set forth can be considered material.

## I.

Summary judgment provides a means of disposing of cases with dispatch, but it is a drastic method and should only be allowed when the right of the party to invoke that drastic method is free from doubt. (*Interlake, Inc. v. Harris Trust and Savings Bank* (1978), 57 Ill. App. 3d 524, 373 N.E.2d 413, *appeal denied; Harris Trust Savings Bank v. Joanna-Western Mills Co.* (1977), 53 Ill. App. 3d 542, 368 N.E.2d 629.) It is to be awarded with caution so as not to preempt the right of a trial by jury or the right to present fully the factual basis for a claim where a material dispute may exist. (*Borus v. Yellow Cab Co.* (1977), 52 Ill. App. 3d 194, 367 N.E.2d 277; *Interlake, Inc. v. Harris Trust and Savings Bank* (1978), 57 Ill. App. 3d 524, 373 N.E.2d 413, *appeal denied* (1978), 71 Ill. 2d 608.) Furthermore, the issue of negligence is ordinarily and preeminently a question of fact for the jury to decide. (*Kahn v. James Burton Co.* (1955), 5 Ill. 2d 614, 126 N.E.2d 836; *Hays v. Place* (1953), 350 Ill. App. 504, 113 N.E.2d 178; *Bartels v. McGarvey* (1945), 327 Ill. App. 206, 63 N.E.2d 617; 28 Ill. L. & Prac. *Negligence* §§262, 264 (1957).) As stated by Justice Scheineman in *Hays v. Place* (1953), 350 Ill. App. 504, 509, 113 N.E.2d 178, 180, "Jurors are supposed to be competent in everything pertaining to the ordinary and common knowledge of mankind. [Citation.] For this reason, they set the standard of care, except where the standard is fixed by law. Hence, whether conduct established by the evidence amounts to due care, or is negligence, is normally a question for the jury." And as we pointed out in *Borus v. Yellow Cab Co.* (1977), 52 Ill. App. 3d 194, 367 N.E.2d 277, most courts refuse, properly, to become a "thirteenth juror"

or to substitute their judgment for that of the jury. While in *Borus*, the trial court had granted summary judgment on the basis that the plaintiff was contributorily negligent as a matter of law, the reasoning of this court is equally pertinent here.

## II.

■■ The first point made by the judge was that the service was only temporary. However, we know of no case which has held that one installing an electrical line owes a lesser duty when the service is only temporary. The distribution of electrical energy is an inherently dangerous enterprise and power companies and those installing such lines are required to exercise a high degree of care to see that their wires are properly placed and insulated. (*Spence v. Commonwealth Edison Co.* (1975), 34 Ill. App. 3d 1059, 340 N.E.2d 550.) Electricity has been characterized as "a silent, deadly and instantaneous force" (*Merlo v. Public Service Co.* (1942), 381 Ill. 300, 312, 314, 45 N.E.2d 665, 673), comparable to the "operation of a firing range or the handling of explosives." (*Mullen v. Chicago Transit Authority* (1961), 33 Ill. App. 2d 103, 113, 178 N.E.2d 670, 674, *appeal denied* (1962), 22 Ill. 2d 625 (third rail).) As the court in *Austin v. Public Service Co.* (1921), 299 Ill. 112, 118, 119, 132 N.E. 458, 460, 461, quoted in *Merlo v. Public Service Co.* (1942), 381 Ill. 300, 312-13, 45 N.E.2d 665, 673, stated:

> "* * * one who uses [electricity] for profit is bound to exercise care corresponding to the dangers incident to its use. With the advance of civilization electricity has become a necessity, and in order to make it useful to man it must be carried from place to place. The restrictions governing the handling of this commodity by public or private corporations or by individuals must, in view of its commercial and domestic importance, be reasonable. One engaged in the business of manufacturing, transmitting and distributing electric current is only required to exercise such care and caution as a person of ordinary prudence might reasonably be expected to exercise in the handling of such a silent and dangerous agency under similar circumstances, and if he places his wires in such a position that they will not inflict injury on a person in the exercise of his rights and privileges while he is using due care and caution for his own safety he has fully performed the duty which the law imposes upon him. * * * Persons handling electricity must protect the public against danger by the proper insulation of its wires where the public is likely to come in contact with them. But this duty does not extend to the entire system. Persons engaged in the transmission of electricity are not insurers of the safety of the public, but they are bound to know the dangers incident to

handling electricity and to guard against such dangers by the exercise of care commensurate with them."

*Merlo* went on to state at 381 Ill. 314-15, 45 N.E.2d 674:

"From the very nature of its business, an electric company using highly charged wires owes the legal duty toward every person who, in the exercise of a lawful occupation in a place where he has a legal right to be, whether for business, pleasure or convenience, is liable to come in contact with the wires to see that such wires are properly placed with reference to the safety of such persons and are properly insulated. (18 Am. Jur. p. 485.) This is nothing more than the ordinary care required under the circumstances when put into practice. The reason for requiring insulation and vigilance in maintaining the wires in proper condition is the deadly and dangerous power of the current carried along such wires."

■■ In light of the inherently dangerous nature of the activity, there is no reason to impose a lesser degree of duty upon one installing temporary wires rather than permanent wires. To the contrary, in a construction situation he may be required to exercise even more care than normally required since he is put on notice that men will be working around the wires and equipment will be moved underneath them. Compare *Rowe v. Taylorville Electric Co.* (1904), 213, Ill. 318, 72 N.E. 711; *Merlo v. Public Service Co.* (1942), 381 Ill. 300, 45 N.E.2d 665; *Clinton v. Commonwealth Edison Co.* (1976), 36 Ill. App. 3d 1064, 344 N.E.2d 509; *Burke v. Illinois Power Co.* (1978), 57 Ill. App. 3d 498, 373 N.E.2d 1354, *appeal dismissed* (1978), 71 Ill. 2d 607.

## III.

■■ ■ The second ground relied on by the trial court was that the defendant had complied with all sections of the code at the time of the erection of this temporary service. The only "proof" to this effect we have been able to find in the record is the statement in the affidavit of Duane Schmitt, an employee of the defendant, that the installation conformed with every standard and code known to him as an expert in the installation of electric service, and certain statements in Spencer's affidavit that the minimum vertical clearance requirement from Commonwealth Edison's System Standard is 20 feet. Schmitt's statement obviously is only a conclusion insufficient for a motion for summary judgment. (Ill. Rev. Stat. 1977, ch. 110A, par. 191(a); *Anderson "Safeway" Guard Rail Corp. v. Champaign Asphalt Co.* (1971), 131 Ill. App. 2d 924, 266 N.E.2d 414; *Tau Delta Phi v. Gutierrez* (1967), 89 Ill. App. 2d 25, 232 N.E.2d 205; *Kaminski v. Missionary Sisters of Sacred Heart* (1965), 62 Ill. App. 2d 216, 210 N.E.2d 794.) Furthermore, as the defendant itself admits, even if the defendant was in compliance with all standards and

codes, this would not prove the defendant was not negligent. For example, it could not be seriously contended that a defendant could, without negligence, string lines with a clearance of only 20 feet, even if the standards allowed it, if the defendant was aware that equipment 27 feet high would be moving underneath the lines.

## IV.

The last and major issue is who determined the nature and location of the wires. If Ragnar Benson did, the issue becomes whether the defendant can avoid liability by delegating its duty to others. Specifically, did the defendant have a continuing duty to: (1) determine the location of planned construction, (2) require that a safe line be erected, and (3) anticipate changes in the construction site. Defendant appears to contend that it was only required to erect a line which was safe on the day it was installed.

First we are persuaded that an issue of fact exists as to who determined the nature and location of the line. It is true that Spencer testified that he had Mr. Bergstrom, Ragnar Benson's project manager, state where the line should be and that Schmitt, who was on the job site when the line was installed, stated he located a man from Ragnar Benson and had him stake elevation and pole location. Furthermore, Spencer testified that Bergstrom did not want the electricity stepped down to 120 volts because the 7200-volt line was cheaper. However, Joseph Pfendt, a vice president of Ragnar Benson, testified that Ragnar Benson did not tell Utility where they wanted the line and Utility just put the line in to the best of its ability. He further testified that the only information that would be given to the electrical contractor regarding the amount of power would be the electrical needs of Ragnar Benson. Since it is clear that despite Spencer's testimony, Bergstrom himself did not stake the line, the jury could conclude that whoever did so, did so only at Schmitt's request and not as an authorized agent of Ragnar Benson. The trial court concluded that Ragnar Benson's decision not to drain the pond dictated the location of the lines. But in fact there was no evidence that the lines could not have been moved further away from the automotive center. Moreover, it is noteworthy that Spencer himself conceded that because he did not want to offend Ragnar Benson he did not suggest that they move their work area although it would have been cheaper to "drop" a 120-volt line south of the dirt roadway.

Furthermore, we cannot agree with the defendant's argument that as a matter of law it cannot be held liable if it merely followed instructions, or if the lines were safe on the day they were installed. As the court pointed out in *Burke v. Illinois Power Co.* (1978), 57 Ill. App. 3d 498, 373 N.E.2d 1354, *appeal dismissed*, (1978), 71 Ill. 2d 607, the duty of the

company to warn or make safe should not be diluted, and, where the accident was foreseeable, the defendant cannot avoid liability merely because of the negligent action or inaction of some other person. *Felty v. New Berlin Transit Inc.* (1978), 71 Ill. 2d 126, 374 N.E.2d 203; *Burke v. Illinois Power Co.* (1978), 57 Ill. App. 3d 498, 373 N.E.2d 1354, *appeal dismissed*, 71 Ill. 2d 607.

Aside from the testimony already mentioned, that Spencer never suggested the line be installed elsewhere, there was no evidence that Spencer or anyone else ever warned Ragnar Benson that the installed line would be hazardous, or objected to installing it there although Spencer testified that he would not build a line if it was not safe. It also appears from Spencer's testimony that he never attempted to determine where the building would be constructed but simply relied on Bergstrom. While the defendant contended that at the time the wiring was installed it was installed at a sufficient height from ground level, Spencer testified the defendant had to know the contemplated grade changes before the poles were installed. Likewise, there was testimony that Marshall Fields determined that their line was too dangerous and had the 7200-volt wire replaced with a secondary wire (120/240 or 120/208) so that if a crane did get hit, it would not hurt anything, yet the defendant did not require or even urge Ragnar Benson to put in the same type of line instead of the 7200-volt primary line. In short, we disagree with the defendant's contention that as long as it followed instructions it could not be held liable for the accident. A person may at times have a duty to refuse to follow instructions if he knows that serious injury or death may result if he complies.

Nothing in this opinion is intended to suggest that this court has concluded that the defendant was in fact guilty of negligence. That is for the jury to determine upon trial. Likewise, we are not suggesting that the only evidence which might be relevant to establish whether the defendant is guilty of negligence is that discussed in this opinion—the only import of our ruling being that it is clear that there are questions of fact for jury determination and that summary judgment was improperly awarded.

Accordingly, the judgment of the trial court is reversed and the cause remanded for further proceedings.

Reversed and remanded.

JOHNSON and LINN, JJ., concur.