ELIJAH TURNER, Plaintiff-Appellee, *v.* CHICAGO TRANSIT AUTHOR-ITY *et al.,* Defendants-Appellants.

First District (5th Division)   No. 82—3055

Opinion filed March 9, 1984.

420

O'Halloran, Lively & Walker, of Northbrook (James E. O'Halloran, Jr., and Stephen J. O'Neil, of counsel), for appellants.

William J. Harte, Ltd., of Kroll & Rubin, both of Chicago (William J. Harte, of counsel), for appellee.

JUSTICE WILSON delivered the opinion of the court:

Plaintiff brought suit to recover damages for personal injuries suffered as a result of the alleged negligence of defendant Bolton, a bus driver employed by defendant Chicago Transit Authority (CTA), in the operation of a CTA bus. Following a trial by jury, judgment was entered against defendants with total damages assessed at $212,500, subsequently reduced to recoverable damages of $132,812.50 as a result of a finding that plaintiff was 37.5% contributorily negligent. On appeal, defendants allege that: (1) the jury's verdict was against the manifest weight of the evidence; (2) the trial court erred when it admitted evidence of a prior consistent statement to rehabilitate the plaintiff; and (3) the jury's award for lost income and lost earning ca-

pacity was erroneously premised on speculation and inadmissible evidence. For the reasons that follow, we affirm in part and reverse in part.

On May 13, 1977, approximately 5:30 a.m., a CTA bus driven by defendant Bolton collided with plaintiff within a few feet of the intersection of Lotus and Chicago Avenue in Chicago. The impact of the collision threw plaintiff to the ground between the curb and the bus, and the right rear wheel of the CTA bus ran over his left arm.

In his testimony as an adverse witness pursuant to section 2—1102 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 2—1102), defendant Bolton stated that at the time of the collision, he was driving the bus at a speed between two to three miles per hour, traveling in an easterly direction in the right-hand parking lane of Chicago Avenue, approximately four feet from the curb. When he heard the sound of an impact on the right side of the bus to the rear of the rear door, he immediately stopped the bus to investigate the situation. Defendant admitted that he had seen plaintiff prior to the collision and could have stopped, but denied that plaintiff had been trying to flag the bus.

When questioned by defense counsel, defendant stated that when he first observed plaintiff, plaintiff was walking down the middle of the sidewalk in an "unusual manner, staggering up upon his toes," heading west on Chicago Avenue. Upon observing plaintiff, defendant put his foot on the brake, tooted his horn, and moved away from the curb as much as possible. A passing truck prohibited him from actually pulling into the left lane. Plaintiff did not respond to the horn and defendant continued to drive past him, momentarily glancing in his right-hand rear view mirror. No part of the front of the bus ever came into contact with plaintiff, the wheels of the bus never went onto the curb, and the bus driver never turned the bus toward the right-hand curb or made any other sudden or jerky turns. The speed limit on Chicago Avenue is 30 miles per hour. There was no bus stop at the corner of Lotus and Chicago Avenue.

Next, plaintiff testified that on the morning of May 13, 1977, he left his mother's house and was walking west on Chicago Avenue, looking for a bus to take him east. He spotted defendant's bus approximately 1½ blocks away and started to jog to the nearest corner at Lotus and Chicago Avenue, unaware that this corner was not a designated bus stop. The bus was traveling between 5 to 15 miles per hour and maintained a distance of about two feet from the curb. Plaintiff stood on the curb and waved his hand in an attempt to flag down the bus. He did not hear the bus driver sound his horn. Plaintiff

continued to wave at the bus as it approached the corner, but the bus did not slow down or stop. Although plaintiff could see the bus driver, the driver did not indicate that he had seen plaintiff. When plaintiff came in contact with the bus between the front and rear doors, the impact threw him onto the pavement and the rear wheel of the bus ran over his arm.

On the morning of the accident, plaintiff, unemployed, was on his way to find employment. At the time, he had no offers of employment. Prior to being laid off from his most recent job, plaintiff had worked as a die setter for which he had earned approximately $17,000 per year. As a result of his injury, plaintiff's left arm is permanently disabled, rendering him physically unable to do his former type of work. Instead, plaintiff is limited to performing less physically-demanding work for which he is paid a lower salary. Plaintiff estimated his yearly earnings in 1978 to have been approximately $12,000. At the time of the trial in 1982, plaintiff was again unemployed. Since the accident, he has had difficulty keeping a job because he cannot do any heavy lifting.

During cross-examination, when plaintiff stated that he might have had a couple of beers about 12:30 a.m. on the morning of the accident, defense counsel impeached his testimony with a prior inconsistent statement taken from plaintiff's deposition wherein he had stated that he had been working on his friend's car the night before the accident until about 1 a.m., after which they had a few beers around 2:30 or 3 a.m. Plaintiff admitted that he had not looked around for a designated bus stop on the morning of the accident. Rather, he intended to flag down a bus when he saw one. Plaintiff never stepped off the curb, and had no idea how far his arm was extended into the street while he was waving. No portion of the front of the bus hit his extended arm. Plaintiff further indicated that he was unsure as to whether his waving arm hit the bus or the bus hit his arm. However, he was certain that the wheels of the bus never went over or up onto the curb, and that the bus never jerked left or right, but maintained a two-foot distance from the curb. Plaintiff denied telling anyone that the accident occurred when he spun off the curb, stating that he did not fall off the curb until after the bus hit him. At this point, defense counsel again impeached plaintiff from a deposition statement wherein plaintiff explained that he "got in a spin hitting on the side of [the bus]." Plaintiff also denied telling his treating doctor that he had slipped and fallen under a bus.

Thereafter, during redirect, when plaintiff's counsel attempted to rehabilitate plaintiff from the same deposition used to impeach his tes-

timony regarding the time at which he had had a few beers on the morning of the accident, defense counsel asked for a sidebar during which he argued that there is no authority that allows a party to be rehabilitated by a past consistent statement. Relying on Supreme Court Rule 212(c) (87 Ill. 2d R. 212(c)) (Rule 212(c)), the court allowed plaintiff's counsel to rehabilitate by reading an omitted part of the deposition that was used to impeach. As a result, the following excerpt from the deposition was read in front of the jury:

"Q. When did you have beers, at what time?
A. I guess it must have been about 12:30, I guess."

Dr. William Newman, orthopedic surgeon at St. Anne's Hospital where plaintiff was treated, testified that he first examined plaintiff on May 13, 1977, at which time plaintiff told him that while trying to catch a bus, ¹ ˉ had slipped and fallen under the bus which then ran over his arm. Although Newman did not notice any particular symptoms of plaintiff's intoxication, another doctor had noted on plaintiff's medical record that plaintiff had had a hangover at the time.

After stipulating that pursuant to a recognized mortality table, plaintiff, age 41, would live another 29.2 years, plaintiff rested his case. Thereafter, the trial court denied defendant's motion for a directed verdict, stating, *inter alia*, that the evidence presented a factual situation for the jury. Further, "[t]he bus *** came within two feet of the curb, which *** [c]ould be considered negligence and which raises a question whether the driver was keeping a proper lookout."

Next, Glen Ward testified on behalf of defendants that he had observed the accident while sitting in the second seat directly behind the rear door of the bus. From this vantage point, he saw plaintiff waving his arm and running toward the curb "like he had just woken up or like had been drinking something." In Ward's opinion, plaintiff could have been under the influence of alcohol at the time. Plaintiff then slipped just as the bus was passing him, coming into contact with the bus right behind the rear door. Ward did not hear any noise from the impact, but noticed that the bus stopped immediately. Ward stated that the bus did not run into plaintiff. Rather, plaintiff ran into the bus.

On cross-examination, Ward admitted that he did not actually see plaintiff's feet slip off the curb. He also did not hear a horn. At the time of the accident, the bus was between three to six feet from the curb. Ward could see the curb from where he was sitting.

Dr. Jolanda Peckus, emergency medicine specialist at St. Anne's Hospital, then testified that she treated plaintiff in the emergency room on the morning of May 13, 1977. The treatment included a

blood alcohol test which indicated that plaintiff had an alcohol level of 280 milligrams. The normal level is 0 and a level around 100 is considered significant. Further, plaintiff told Peckus that he had consumed two to three six-packs of beer and had fallen toward a bus, injuring his arm.

Plaintiff then took the stand again and testified that on the evening before the accident, he was at home and had gone to bed approximately 1 a.m. At this point, defense counsel impeached plaintiff's testimony with statements taken from his earlier deposition indicating that he had been working on his friend's car until approximately 1 a.m. When plaintiff denied drinking any alcoholic beverage between midnight and 5:30 a.m. on May 13, 1977, defense counsel again impeached him with the following deposition statements:

"Q. How about from 12:00 on May 13, 1977 until the time of the accident at 5:30, did you have anything to drink?

A. From 12:00 I didn't have anything up until about one, I guess it was, when I went home to clean up.

Q. Where were you drinking at is what I'm trying to find out? [Sic.]

A. At his garage.

Q. Were you drinking at his house?

A. Not drinking but a couple of beers.

Q. When did you have the beers? At what time?

A. I guess it must have been about 12:30, I guess.

Q. 12:30 in the morning?

A. Yes.

Q. And how many beers do you recall?

A. Two, three."

Plaintiff did not recall giving those answers at the deposition. Defendants then rested their case. Following a conference on jury instructions, defendants' motion for a directed verdict and plaintiff's motion for a directed finding of negligence were denied.

During his closing argument, plaintiff's counsel discussed, *inter alia*, the areas of "nature, extent, duration, disability, disfigurement and pain and suffering" for the computation of damages. Counsel explained that while these elements were not "easily mathematically computable," they were "very important elements of damages." For the nature and extent of plaintiff's injury, counsel suggested $25,000 in damages. For the element of duration, he suggested $29,000 in damages based upon a suggested formula of $1,000 per year for 29 years (plaintiff's life expectancy). Total damages requested were $237,885.95. Thereafter, the jury returned with its verdict, finding

defendants 62.5% negligent, and plaintiff 37.5% contributorily negligent, with recoverable damages assessed at $132,812.50.

OPINION

Defendants first contend that the jury's finding of negligence and its allocation of comparative negligence "flies directly in the face of the clear, overwhelming and manifest weight of the evidence," and that the trial court erred in denying defendants' motions for a directed verdict, judgment notwithstanding the verdict (judgment *n.o.v.*), or for a new trial.

The propriety of a directed verdict or judgment *n.o.v.* must be analyzed by the standard set forth in *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, where the supreme court stated: "In our judgment verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (37 Ill. 2d 494, 510.) Moreover, negligence may be established by either direct or circumstantial evidence from which reasonable inferences may be drawn. (*Mort v. Walter* (1983), 98 Ill. 2d 391, 396.) With respect to a new trial, where the trial court has denied a motion for a new trial, the reviewing court will not disturb the findings of the jury unless the verdict is against the manifest weight of the evidence. (*Spankroy v. Alesky* (1977), 45 Ill. App. 3d 432, 439, 359 N.E.2d 1078.) The jury's verdict cannot be set aside merely because the jury could have drawn different inferences and conclusions from conflicting testimony or because the reviewing court would have reached a different conclusion if it had been the trier of fact. *Tihay v. Aurora City Lines* (1967), 79 Ill. App. 2d 107, 116, 223 N.E.2d 171.

In the present case, plaintiff alleged that defendants breached both a statutory duty of care and common law duty of care by their failure to do one or more of the following: (1) operate and control the bus; (2) stop or slow down when danger to the plaintiff was imminent; (3) keep a proper look-out; and (4) sound the horn to avoid collision with the plaintiff. In making its determination as to these allegations, the court instructed the jury, in part, as follows:

"There was in force in the State of Illinois at the time of the occurrence in question a certain statute [citation] which provided that:

'Every driver of a vehicle shall exercise due care to avoid colliding with any pedestrian and shall give warning by sounding the horn when necessary and shall exercise proper

precaution upon observing any child or obviously confused, incapacitated or intoxicated person.'

If you decide that a party violated the statute on the occasion in question, then you may consider that fact together with all the other facts and circumstances in evidence in determining whether or not a party was negligent before and at the time of the occurrence.

It is the duty of every driver of a vehicle using a public highway to exercise ordinary care at all times to avoid placing himself or others in danger and to exercise ordinary care at all times to avoid a collision."

■ Upon reviewing the record, we find that testimony elicited at trial could support conclusions by the jury that defendant bus driver had failed to slow or stop the bus, sound his horn, or turn the bus away from the curb when the driver saw plaintiff "staggering" toward the curb, attempting to flag the bus. Further, it is conceivable that the jury found these nonactions to have violated the duties of care set forth by the court. Thus, we cannot say that the evidence, when viewed in the light most favorable to plaintiff, so overwhelmingly favors defendants that no contrary verdict could stand. For the same reasons, neither can we conclude that the jury's verdict as to negligence was against the manifest weight of the evidence. (*Spankroy v. Alesky* (1977), 45 Ill. App. 3d 432, 439, 359 N.E.2d 1078.) Therefore, we affirm the trial court's denial of a directed verdict, judgment *n.o.v.* and a new trial on the issue of negligence.

As a final note with respect to the manifest weight question, we acknowledge the numerous case-law references cited by both plaintiff and defendants which present a variety of factual situations involving motor vehicle collisions. While each case has its factual similarities to the present case, each one also has its factual dissimilarities. Thus, aside from applicable rules of law cited therein, we do not find any of the cited cases dispositive of the negligence issue before this court. Therefore, rather than encumber this opinion with a lengthy discussion of the pivotal distinguishing factors, suffice it to say that we found none of the cases persuasive on their facts.

The next issue presented to this court is whether Rule 212(c) authorizes the use on redirect of a prior consistent statement taken from a deposition to rehabilitate a witness who has been impeached on cross-examination by a prior inconsistent statement taken from the same deposition. Rule 212(c) provides:

"If only a part of a deposition is read or used at the trial by a party, any other party may at that time read or use or re-

quire him to read any other part of the deposition which ought in fairness to be considered in connection with the part read or used." 87 Ill. 2d R. 212(c).

The purpose of Rule 212(c), as stated in the 1956 Joint Committee Comments, is "to avoid the unfairness and distortion which may result if a party is permitted to read isolated out of context portions of a deposition without permitting the opponent to read or require the other party forthwith to read other relevant portions of the deposition." Ill. Ann. Stat., ch. 110A, par. 212(c), Historical and Practice Notes, par. (c), at 170 (Smith-Hurd 1968).

■ Juxtaposed to Rule 212(c) is the well-established common law axiom that "[p]roof of the out of court declarations of a witness, in corroboration of testimony given by him on the trial of the case, is, as a general rule, inadmissible, even after he has been impeached or discredited." (*Schmitt v. Chicago Transit Authority* (1962), 34 Ill. App. 2d 67, 72, 179 N.E.2d 838.) As accurately pointed out by defendants, the relationship between Rule 212(c) and the common law rule of evidence was addressed by this court in *Schmitt v. Chicago Transit Authority* (1962), 34 Ill. App. 2d 67, 179 N.E.2d 838, and found to be compatible. In essence, the *Schmitt* court interpreted the fairness provision of Rule 212(c) as permitting rehabilitation by prior consistent statements from depositions to explain or clarify testimony in an effort to avoid distortion of the facts by isolated and out-of-context statements. In substance, the *Schmitt* decision is judicial affirmance of Rule 212(c)'s purpose as stated in the aforementioned Joint Committee Comments. The key words in the *Schmitt* holding are "explain" and "clarify" because while they broaden the common law rule of evidence, they also limit application of Rule 212(c). In other words, although Rule 212(c) provides a statutory exception to the common law rule of inadmissibility of prior consistent statements from depositions, Rule 212(c)'s fairness provision, as interpreted by the courts, limits the exception to statements that explain or clarify prior impeachment testimony taken from the same document. See also *Lanning v. Wiatr* (1979), 76 Ill. App. 135, 137, 394 N.E.2d 873, and *Redding v. Schroeder* (1964), 54 Ill. App. 2d 306, 313, 203 N.E.2d 616.

■ In the present case, plaintiff testified during cross-examination that he had been drinking at approximately 12:30 a.m. on the morning of the accident. Defense counsel then impeached him with a deposition statement that indicated he had been drinking as late as 2:30 a.m. that morning. On redirect, over defense counsel's objection, plaintiff's counsel rehabilitated plaintiff's testimony with a statement taken from that same deposition stating that plaintiff had been drink-

ing at 12:30 a.m. or 1 a.m. Relying on 212(c), the trial court allowed the rehabilitation. It is our opinion that because the rehabilitation statement did not explain or clarify the impeachment statement, but only contradicted it, it was improperly admitted. However, we do not agree that the erroneous admission prejudiced defendants in any way. Defendants argue that they were prejudiced by the rehabilitative testimony in three ways: (1) plaintiff's credibility was enhanced; (2) defendants were denied the right to present a complete defense; and (3) plaintiff was able to create the impression that alcohol was consumed the night before the accident rather than that morning. We disagree. Plaintiff's contradictory statements as to the time he had had a drink and his obvious confusion during cross-examination regarding his activities on the morning of the accident in no way operated to enhance his credibility. In fact, it is more likely that these inconsistencies had the opposite effect. Furthermore, defendants were not denied the opportunity to present a clear defense. The bus driver, passenger and both doctors testified as to plaintiff's intoxicated condition at or near the time of the accident. Moreover, the jury's finding of 37.5% contributory negligence is further evidence that the rehabilitative testimony did not prejudice defendants. Therefore, although we find that the trial court erred in admitting plaintiff's prior rehabilitative statement, we conclude that the error was harmless and does not constitute grounds for reversal.

■ We turn next to defendants' contention that the jury's awards for lost income and lost earning capacity were based upon speculation and inadmissible evidence and should be reduced accordingly. In response, plaintiff argues that testimony as to his 18-month incapacitation immediately after the accident is reliable enough for the jury to have arrived at an award for lost income, and testimony as to plaintiff's limited employment capabilities is reliable enough for the jury to have determined an amount for lost earning capacity. Moreover, plaintiff contends that pursuant to *Stephenson v. Air Products & Chemicals, Inc.* (1969), 114 Ill. App. 2d 124, 252 N.E.2d 366 and *Orlandi v. Caraway* (1973), 9 Ill. App. 3d 628, 293 N.E.2d 337, the jury's assessment of damages must stand unless this court determines that the damage assessment was clearly erroneous. After careful examination of the record, we find that the introduction of certain evidence regarding damages was improper and prejudicial to defendants and, therefore, conclude that the damage assessment was clearly erroneous.

It is indisputable that lost income is a proper element of damages to be considered by the trier of fact. However, recovery must be lim-

ited to such loss as is reasonably certain to occur and cannot be based on testimony which is merely speculative, remote or uncertain. (*Christou v. Arlington Park—Washington Park Race Tracks Corp.* (1982), 104 Ill. App. 3d 257, 260, 432 N.E.2d 920.) In the present case, it is uncontroverted that plaintiff was unemployed at the time of the accident and had no firm offers for a job in the future. The fact that he intended to look for a job on the day of the accident is indicative of nothing more than his unemployment. Plaintiff argues that "the jury could have concluded that plaintiff would have been successful in his attempt to find other work on the day he was injured." This may be true. However, such a conclusion would have been based upon conjecture and speculation, which, pursuant to Illinois law, is an improper basis for a determination of lost income. Accordingly, because there was no evidence establishing with reasonable certainty that, but for the accident, plaintiff would have been employed at a similar job during his 18-month period of incapacitation, we conclude that the admission of evidence regarding plaintiff's salary for a job he did not have at the time of the accident for the computation of lost income was improper and constituted reversible error on the issue of damages.

■ Although our decision to reverse on the issue of damages and remand for a new trial obviates the need to discuss the remaining damages-related allegations, in the interests of expediting a final resolution of this controversy upon remand, we shall address those issues at this time. With respect to his lost earning capacity, plaintiff requested the difference between his salary as a heavy machine operator (the type of work he performed prior to the accident) and his salary as a light machine operator (the type of work he is limited to performing as a result of the accident). Relying on the fact that plaintiff was unemployed at the time of the accident and at the time of trial, defendants argue that the estimated forecast on lost earning capacity was highly speculative and contrary to the manifest weight of the evidence. In our opinion, these periods of unemployment are irrelevant to the determination of lost earning capacity. Whether or not plaintiff was actually employed at either of those specific times, the fact remains that because of the accident, plaintiff is unable to perform the higher-paying type of work he actually did perform prior to May 13, 1977. The evidence reveals that between the accident and the trial, plaintiff had held approximately six jobs, all of which were basically similar in the type of physical labor required. In our opinion, testimony regarding these jobs provided a sufficient basis for a determination of the type of work plaintiff was able to perform and his testimony as to salary before and after the accident was sufficient to

establish a comparative salary range. Thus, we do not find that the award for lost earning capacity was speculative or contrary to the manifest weight of the evidence. Accordingly, we find *Christou v. Arlington Park-Washington Park Race Tracks Corp.* (1982), 104 Ill. App. 3d 257, 432 N.E.2d 920, distinguishable on the issue of lost earning capacity. In *Christou*, plaintiff attempted to establish decreased earning capacity based upon a job that he had never held. In our case, as stated, plaintiff had been employed in both types of work used to determine the difference in earning capacity.

Defendants further argue that plaintiff's use of a mathematical formula in his request for damages for disability was contrary to the Illinois supreme court's ruling in *Caley v. Manicke* (1962), 24 Ill. 2d 390, 182 N.E.2d 206 and, as such, constituted prejudicial error. The *Caley* court was confronted with the question whether the scope of proper jury argument permits the use of a mathematical formula from which counsel may argue that an award for pain and suffering should be based upon a specific sum per day, or other fixed unit in time. In holding that use of a formula is improper, the *Caley* court stated,

> "We are of the opinion that an impartial jury which has been properly informed by the evidence and the court's instructions will, by the exercise of its conscience and sound judgment, be better able to determine reasonable compensation than it would if it were subjected to expressions of counsels' partisan conscience and judgment on the matter." 24 Ill. 2d 390, 393-94.

■ While we concur with defendants' interpretation of *Caley*, we find the distinguishing factors of *Warp v. Whitmore* (1970), 123 Ill. App. 2d 157, 260 N.E.2d 45, dispositive of the issue at bar. In *Warp*, the court distinguished the situation before it from that in *Caley* on three grounds: (1) the sums stated by plaintiff's counsel were presented as suggestions, not mandated formulas; (2) defense counsel did not object at the time the argument was made to the jury; and (3) plaintiff's counsel did not challenge defense counsel or offer a better scheme for determining damages. (123 Ill. App. 2d 157, 164.) We find the present case distinguishable from *Caley* for the same reasons and, thus, do not feel that plaintiff's suggestion of an award for disability based upon $1000 per year for a life expectancy of 29 years constituted prejudicial error.

■ Finally, relying on the recent supreme court decision in *Powers v. Illinois Central Gulf R.R. Co.* (1982), 91 Ill. 2d 375, 438 N.E.2d 152, defendants argue for the first time in their reply brief that the trial court erred in giving instructions to the jury which listed separate damages for "nature, extent and duration" of plain-

tiff's injury. In *Powers*, the court held that a jury should no longer be instructed to consider the nature, extent and duration of a plaintiff's injury as a separate and compensable element of damages when other elements of damage such as pain and suffering, economic loss through lost earnings, and disability were also to be considered. The court explained that "[a]ny award for elements such as disability, pain and suffering, or disfigurement will of necessity involve and be based upon the jury's examination of and assessment of the nature, extent and duration of the injury." 91 Ill. 2d 375, 382.

In response, plaintiff argues that defendant has waived this argument by his failure to object to the instructions at trial. Our decision to reverse the trial court's judgment on the issue of damages and remand the cause for a new trial obviates the need to address the waiver argument.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed as to the issue of liability, reversed as to the issue of damages and the cause is remanded for a new trial on the issue of damages only.

Affirmed in part; reversed and remanded in part.

MEJDA, P.J., and LORENZ, J., concur.