(No. 69053.—

PAUL DOSER, Appellant, v. SAVAGE MANUFACTUR-
ING AND SALES, INC., *et al.*, Appellees.

*Opinion filed December 20, 1990.—Rehearing denied*
*April 1, 1991.*

178

MILLER, J., dissenting.

Bernard R. Nevoral & Associates, Ltd., of Chicago, for appellant.

Burr E. Anderson, of Anderson & Dub, of Chicago, for appellee Savage Manufacturing and Sales, Inc.

Pappas, Power & Marcus, of Chicago (Debra K. Marcus and William R. Power, of counsel), for appellee Chrysler Motors Corp.

JUSTICE CALVO delivered the opinion of the court:

Plaintiff, Paul Doser, filed a strict products liability suit in Cook County against defendant, Savage Manufacturing and Sales, Inc. (Savage), for injuries he received while working on a four-ton, C-frame hydraulic press manufactured by Savage. Savage then filed a third-party complaint against Chrysler Motors Corporation (Chrysler), Doser's employer. Doser subsequently entered into a settlement agreement with Chrysler, and the circuit court dismissed Savage's claim against Chrysler. Following a trial, the jury returned a verdict against Savage and in favor of Doser, awarding Doser $205,000 in damages. The jury, however, also found Doser 20% responsible for his injuries and reduced Doser's award by that percentage; resulting in a net verdict of $164,000 in Doser's favor. Savage appealed the jury verdict and the

circuit court's dismissal of its claim against Chrysler. The Appellate Court, First District, with one justice dissenting, reversed the jury verdict, but did not address the issues related to Chrysler. (184 Ill. App. 3d 405.) We allowed Doser's petition for leave to appeal (107 Ill. 2d R. 315).

Doser testified at trial that he was 43 years old and had worked as an employee of Chrysler for 17 years. At the time of his injury, Doser held the job of subassembler and had held that job for approximately 16 months. As a subassembler, Doser used a hydraulic press to assemble parts that were eventually put into the steering mechanisms of automobiles. The vertical cylindrical ram on the press Doser used descended to force, or press, a bearing into a knuckle. The area directly under the ram is called the point of operation of the press. After Doser finished assembling the parts, he took the parts to the table of Willie Wilcox, a co-employee, located nearby. Wilcox also ran a hydraulic press manufactured by Savage. Wilcox, in performing his job, used Doser's preassembled parts.

On August 8, 1979, after Doser had finished working his shift, he helped Wilcox with Wilcox' job. Doser put a bushing in Wilcox' press and Wilcox pressed two palm buttons which caused the ram to descend and forced the bushing into a steering knuckle. While Doser was assisting Wilcox, Doser slipped and fell. During the fall, Doser reached out and grabbed the press just as the ram was descending. The ram consequently amputated a part of one of Doser's fingers. Doser's testimony revealed that he slipped on oil leaking from the press onto the floor, or on materials on the floor. Doser also indicated at trial that he knew only one person was supposed to run the press.

James Des Jardins testified as an expert witness on behalf of Doser. Des Jardins acknowledged that the press, as sold to Chrysler, had two palm buttons. In order to acti-

vate the ram on the press, the operator had to use both hands to press both buttons. The dual palm buttons thus ensured that the operator's hands would not be near or under the ram when it descended. The press also had an anti-tie-down feature, which prevented someone from tying down the palm buttons into an activated position, and an anti-repeat feature, which prevented the ram from descending more than once when the operator pressed the palm buttons.

Des Jardins testified that the dual palm buttons on the press protected only the operator of the press, not others around the press. Des Jardins asserted that the press needed additional guards to protect other people around the press. According to Des Jardins, an electric or presence-sensing guard (which would include a light curtain, a radio frequency guard or an infrared guard), a fixed barrier guard or an interlocking barrier guard could provide such protection. Des Jardins indicated that any of these types of guards would have prevented Doser's injury and would not have decreased productivity. Based on a reasonable degree of engineering certainty, Des Jardins concluded that the press was unreasonably dangerous for the uses to which it was put because it lacked point-of-operation guards and warnings.

Des Jardins testified that the type of guard used on a press depends upon whether the press is a specific purpose—unifunctional—or general purpose—multifunctional—machine. According to Des Jardins, a general purpose machine is one purchased for a variety of possible uses. Des Jardins testified:

> "[S]uppose a manufacturer who may have fifteen or so different parts he wants to make in that machine, so that when it's purchased, there is no particular one—one particular use for it, and therefore it's not possible to guard the point of operation because the manufacturer simply doesn't

know all the uses that the purchaser is going to put the machine to."

Des Jardins then compared a general purpose to a specific purpose machine:

"Now, converse to [the general purpose machine] is the special purpose or specific purpose press in which there is a use known. There is a single use or maybe two uses, some small number of uses, and they're known to the manufacturer of the machine.

Therefore, he knows what part is going to be made in that press. He knows what tooling is going to be used in that press, and, of course, he knows his machine.

Now, he has the combination and he knows the dangers involved because that's his business.

He has the obligation to guard in that case."

Savage sold the press to Chrysler in 1973 through a broker, Manufacturers Sales Company. Des Jardins testified that he reviewed the internal Chrysler documents which generated the purchase order for the press. He reviewed Savage's catalog and Savage's documents which quoted the price of the press to the broker. Des Jardins also reviewed the purchase order from Chrysler to the broker. Des Jardins pointed out that the diameter of the ram of the press in Savage's catalog was 1¾ inches. The threaded hole in the end of the ram listed in the catalog was 1½ inches in diameter with 12 threads per inch. Des Jardins indicated that the press in the catalog was Savage's standard machine. Referring to Chrysler's internal documents requesting a press, Des Jardins testified:

"[Chrysler wants] a four ton and here is daylight twelve inches, stroke six inches. They go on down and say ram two inches, outer diameter with a seven-eighths inch diameter, nine threads per inch thread hole inside the ram.

And it says these ram dimensions are critical. They are required to accept existing fixtures.

* * *

*** Then there is a quotation to Manufacturers Sale

Company from Savage, and here we're calling out the two inch diameter with the seven-eighths-nine internal thread, which is not their standard. It's a special. Meaning, there has been communication.

Then here is the purchase order which calls for, again— now they're going for a two and a quarter inch O.D. ram, but again this is outside of their one and three-quarter inch standard. They're requiring this seven-eighths inch diameter, nine threads per inch thread.

Now, they tell us specifically what the press is to be used for. It's for series group facilities request and the number for pressing pivot [b]ushing into R.R. spring both sides of line.

These are the kinds of communications that a customer gives to a manufacturer.

We've now specialized the press, and we've told the manufacturer what we're going to build in there, and we've told him that there is existing tooling. So he has all the components there to do the guarding and to know the dangers inherent in that specific point of operation for that specific—one specific job.

And it's my point that he then has the obligation to guard for that danger just as he would guard for any other danger on a machine."

Doser's attorney then asked Des Jardins if any other differences existed between Savage's standard press and the press Chrysler ordered. Des Jardins replied:

"Yes. ***

If we look at the advanced speed here, the advanced speeds, press and retract speeds, are also different than anything advertised there.

So that, again, there is some communication—there is a reason for this.

Normally, the companies I worked for, there was conversation between the customer's engineers and the company's engineers as to why there would be a need for making these changes from a standard machine, otherwise a standard machine was used."

Des Jardins testified that, in his opinion, the press was a specific purpose machine and "the manufacturer should have known the dangers involved and guarded for them accordingly."

On cross-examination, Des Jardins admitted that the purpose for which Chrysler used the press at the time of Doser's injury was different from the purpose for which Chrysler purchased the press. At the time of Doser's injury, the press was used to press bushings into steering knuckles. At the time of purchase, the press was used to press bushings into the rear springs of automobiles. Des Jardins also stated that on a general purpose press the manufacturer has the responsibility to avoid hazards other than operational hazards, and the employer has the responsibility to provide the point-of-operation guards. Des Jardins, however, reiterated that he still thought Savage had manufactured a specific purpose press.

Des Jardins testified that a specific purpose press could be modified later to perform another operation. Nevertheless, Des Jardins asserted he had no knowledge that Chrysler undertook any rebuilding of the press to make it adaptable to an entirely different purpose. Des Jardins stated that unbolting the tooling and bolting another tooling on the press was apparently what was done with the press. Des Jardins also stated that this is part of what is done whenever a general purpose press is adapted from one task to another.

Ralph Barnett testified as an expert witness on behalf of Savage. Barnett testified that a general purpose press can perform an infinite number of tasks. Barnett asserted that a specific purpose machine, however, is only capable of performing one task or only good for one use. A specific purpose machine cannot be used for any other operation, according to Barnett. In order to use a specific purpose machine for another task, Barnett stated, the machine

would have to undergo such a drastic change that the machine would have to be completely redesigned. Barnett indicated that manufacturers put safety devices on specific purpose machines before they release the machines. Manufacturers do not equip general purpose machines with safety devices, Barnett testified, because the manufacturers do not know how the buyers will use the machines.

Barnett testified that barrier guards could not have been used on the Savage press because the operator would not have been able to side-feed the parts into the machine. Barnett stated that a manufacturer does not put barrier guards on a hydraulic press unless the press is a specific purpose machine. In Barnett's opinion, the Savage press was a general purpose press. Regarding Chrysler's purchase order, Barnett testified that it did not contain enough information to construct a specific purpose press. Barnett stated that the purpose of the press when Chrysler ordered it and the purpose of the press at the time of Doser's injury were completely different. If the press had barrier guards on it when Chrysler ordered it, according to Barnett, Chrysler would have had to take off the guards in order for the press to properly carry out the task it was performing at the time of Doser's injury. Based on a reasonable degree of engineering certainty, Barnett testified that the press was not unreasonably dangerous for the purpose for which it was designed. Barnett also asserted that, based on a reasonable degree of scientific certainty, Savage could not have reasonably foreseen, at the time it designed and manufactured the press, that an injury like Doser's would occur.

In reversing the jury's verdict, the appellate court stated:

"Savage maintains that plaintiff's evidence established that no guards were required. Savage's argument is premised on the testimony of plaintiff's expert that if the press was multifunctional, it could not be equipped by Savage with

any particular kind of point of operation safety guard. Savage asserts that the documents submitted to it by Chrysler's broker, and the multiple uses to which Chrysler put the press after it was purchased by Chrysler, demonstrated that the press was multifunctional. Based on these arguments, Savage maintains that the press it sold to Chrysler was not unreasonably dangerous. We agree.

The record shows that the plaintiff's expert witness testified that in his opinion, Savage should have ascertained whether Chrysler intended to use the press for a single purpose or for multiple purposes. Plaintiff's expert further testified that such an inquiry by Savage would have revealed that Chrysler intended to use the press for a single purpose. Based on this conclusion that Chrysler intended the press to be unifunctional as opposed to multifunctional, plaintiff's expert testified that the press, as a unifunctional machine, could have been readily equipped with various types of safety guards at the point of operation.

However, a manufacturer has no duty to inquire whether a machine is intended for single or multiple use by a purchaser. *** The opinion of the plaintiff's expert that the hydraulic press was unifunctional was premised on the assumption that Savage had a duty to inquire whether Chrysler intended the hydraulic press for unifunctional or multifunctional use. Contrary to the opinion of plaintiff's expert, Savage had no duty to so inquire of Chrysler in the case at bar.

Plaintiff produced no evidence at trial to show that Savage had been informed by Chrysler of the particular use to which Chrysler originally intended to put the hydraulic press. Defendant's expert testified that if Chrysler did not inform Savage of the particular use to which Chrysler intended to put the press, the documents received by Savage indicated that Chrysler intended the hydraulic press to be multifunctional. Thus defendant's expert stated that, in his opinion, Savage provided Chrysler a multifunctional hydraulic press. Plaintiff's expert presented no testimony disputing the conclusion of defendant's expert to the effect that the documentation received by Savage indicated an order for a multifunctional hydraulic press. Plaintiff's expert agreed at

trial that it would be virtually impossible to provide safety guards at the point of operation of Savage's hydraulic press if the press were intended for multifunctional use. Plaintiff's expert also admitted at trial that Savage's failure to provide safety guards at the point of operation was not unreasonably dangerous if the press were multifunctional rather than unifunctional. This evidence proved, without contradiction, that Savage's press was not unreasonably dangerous for lack of safety guards at the point of operation." 184 Ill. App. 3d at 408-09.

The appellate court also held that its decision did not contradict our holding in *Rios v. Niagara Machine & Tool Works* (1974), 59 Ill. 2d 79. Based on *Rios*, Doser argued before the appellate court that the multifunctional nature of the press did not alone determine whether the press was unreasonably dangerous. The appellate court replied:

"In *Rios*, the Illinois Supreme Court commented, 'Although the multifunctional nature of a product would be a factor to consider in determining whether a product is unreasonably dangerous, it would not necessarily be decisive of that question.' 59 Ill. 2d at 86-87.

We do not believe this statement by the Illinois Supreme Court in *Rios* should be interpreted to relieve the plaintiff in this case of his burden to produce evidence that Savage's press, as a multifunctional product, was unreasonably dangerous. The record shows that plaintiff produced no evidence to establish how Savage's press, as a multifunctional machine, could have reasonably been fitted with safety guards at the point of operation. Plaintiff's expert witness testified that Savage's press was *not* unreasonably dangerous, as a multifunctional press, for failure to provide safety guards at the point of operation. Thus. the record shows that plaintiff produced no evidence to establish that Savage's press, as a multifunctional machine, was unreasonably dangerous for lack of point of operation safety guards. Accordingly, we find plaintiff's reliance upon the legal principle recognized in *Rios* insufficient ground to affirm the trial court's judgment." (Emphasis in original.) 184 Ill. App. 3d at 409-10.

In his dissent from the opinion of the appellate court majority, Presiding Justice Jiganti indicated: "The majority holds that Savage's press was multifunctional and therefore not unreasonably dangerous for lack of safety guards at the point of operation. *** [T]he majority opinion stands for the proposition of law that a press without safety guards at the point of operation is not unreasonably dangerous if it is multifunctional." (184 Ill. App. 3d at 410 (Jiganti, P.J., dissenting).) Jiganti stated that this proposition is not the law in Illinois. Jiganti asserted:

"In Illinois, the manufacturer is under a nondelegable duty to produce a product which is reasonably safe and such duty is not obviated because a product is multifunctional. [Citations.] Although the multifunctional nature of a product may be a factor to consider in determining whether a product is unreasonably dangerous, it is not, as the majority opinion indicates, determinative of that issue. *Rios v. Niagara Machine & Tool Works* (1974), 59 Ill. 2d 79, 86-87, 319 N.E.2d 232, 236.

In the instant case, the plaintiff's expert testified that based on the documents he reviewed as well as his experience in selling presses, Savage knew that the press would be used to press bushings. Savage also knew the press required several ram dimensions in order to fit the existing tooling which Chrysler intended to attach to the ram. The expert concluded that based on this information, Savage could have guarded the point of operation with one of four types of guards used throughout the press industry. According to the expert, these guards were suitable for the subject press and would have protected the operator as well as others in the area of the press from coming in contact with the point of operation. In his opinion, the press was unreasonably dangerous without one of these guards. The expert acknowledged that at the time of the incident the press was being used for a different purpose. However, the expert testified that the modification of a press to perform a different function did not change his opinion that the press was unreasonably dangerous for failure to properly guard the point of operation.

Although the defendant's expert disagreed with the plaintiff's expert's testimony, a jury verdict should not be set aside merely because the jury could have drawn different inferences and conclusions from conflicting testimony. [Citation.] Viewing the evidence in the light most favorable to the plaintiff, I cannot say that the jury verdict is against the manifest weight of the evidence." 184 Ill. App. 3d at 410-11 (Jiganti, P.J., dissenting).

To recover on a strict products liability theory, Doser had the burden to establish that his injury resulted from the unreasonably dangerous condition of the press and that this condition existed at the time the press left Savage's control. (*Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 623.) A manufacturer has a nondelegable duty to produce a reasonably safe product. (*Anderson v. Hyster Co.* (1979), 74 Ill. 2d 364, 368.) As the court in *Burke v. Illinois Power Co.* (1978), 57 Ill. App. 3d 498, 511, stated:

"There is no concise definition of what constitutes an unreasonably dangerous condition. [Citation.] The question of whether a manufacturer must take various precautions so as not to produce an unreasonably dangerous product varies with the circumstances. The balancing of the likelihood and gravity of harm must be weighed against the burden of the precaution which would be effective to avoid the harm."

Whether a product is unreasonably dangerous for failure to incorporate safety devices is ordinarily a question of fact which the jury should resolve. (*Winnett v. Winnett* (1974), 57 Ill. 2d 7, 13; *Bradley v. Caterpillar Tractor Co.* (1979), 75 Ill. App. 3d 890, 897; *Burke*, 57 Ill. App. 3d at 511.) A reviewing court can reverse a jury verdict only if the verdict was against the manifest weight of the evidence. (*Lawson v. G.D. Searle & Co.* (1976), 64 Ill. 2d 543, 553; *Ford v. City of Chicago* (1985), 132 Ill. App. 3d 408, 412.) A reviewing court can neither substitute its judgment for that of the jury in determining the weight of conflicting evidence nor set aside a verdict simply because the jury could have drawn different conclusions from conflicting testi-

mony. *City of Monticello v. LeCrone* (1953), 414 Ill. 550, 556; *Turner v. Chicago Transit Authority* (1984), 122 Ill. App. 3d 419, 425.

We conclude the appellate court usurped the jury's function by reversing the jury verdict. This case was simply one in which one party's expert disagreed with the other party's expert. The appellate court improperly substituted its judgment for that of the jury on factual issues. It is our determination that the verdict was not against the manifest weight of the evidence.

Des Jardins concluded that Savage's press was a specific purpose press and unreasonably dangerous without guards. On the other hand, Barnett testified that the press was a general purpose press and not unreasonably dangerous. The two experts had differing opinions as to what constituted a specific purpose, or unifunctional, machine. According to Des Jardins, a specific purpose press has only a limited number of functions; however, it can have more than one function. Des Jardins determined that Savage's press had more than one use, but its uses were limited. Consequently, Des Jardins classified the press as a specific purpose machine. Barnett, on the other hand, testified that a specific purpose press has only one function. Because Savage's press could be used for more than one function, Barnett classified it as a general purpose press.

Crucial to Des Jardins' testimony and the appellate court's decision was whether Savage should have known or could have foreseen the uses to which Chrysler put the press. Both experts testified that the type of guard installed on a machine is dependent on the particular task the machine will perform. According to both experts, because a general purpose machine can perform a variety of uses, a manufacturer cannot determine what use will be made of the machine and thus what guard would be adequate. The two experts stated that a manufacturer knows what use will be made of a specific purpose machine and

thus can guard it effectively. Consequently, according to Des Jardins and Barnett, knowledge by the manufacturer of the use to which the machine will be put is a factor in the manufacturer's ability to place adequate guards on the machine.

Des Jardins testified that based on Chrysler's purchase order and the other documents circulated among Chrysler, Savage, and the broker regarding the press, the press was a specific purpose machine. Des Jardins stated that the press Chrysler ordered was different from the standard press Savage listed in its catalog. Des Jardins testified that the documents revealed Chrysler and Savage had communicated regarding the changes to the standard press. These documents also revealed Chrysler intended to use the press to press bushings into the rear springs of automobiles. Based on all of this information, Des Jardins testified that Savage should have known the dangers associated with the press and could have provided adequate guards on it.

Our conclusions regarding Des Jardins' testimony differ from those of the appellate court. Des Jardins testified, according to the appellate court, that "Savage should have ascertained whether Chrysler intended to use the press for a single purpose or for multiple purposes." (184 Ill. App. 3d at 408.) According to the appellate court, Des Jardins also testified "that such an inquiry by Savage would have revealed that Chrysler intended to use the press for a single purpose." (184 Ill. App. 3d at 408.) The appellate court stated further: "Based on this conclusion that Chrysler intended the press to be unifunctional as opposed to multifunctional, [Des Jardins] testified that the press, as a unifunctional machine, could have been readily equipped with various types of safety guards at the point of operation." (184 Ill. App. 3d at 408.) The opinion of Des Jardins that the press was unifunctional, the appellate court stated, "was premised on the assumption that Savage had a duty to inquire whether Chrysler intended the hydraulic press

for unifunctional or multifunctional use." (184 Ill. App. 3d at 408.) The appellate court then held that Savage had no duty to inquire regarding the use to which Chrysler intended to put the press, and Doser "produced no evidence at trial to show that Savage had been informed by Chrysler of the particular use to which Chrysler originally intended to put the hydraulic press." 184 Ill. App. 3d at 409.

We do not agree with the appellate court's characterization of Des Jardins' testimony. Rather than testifying that Savage *should have ascertained* whether Chrysler intended to use the press as a specific purpose press, Des Jardins instead testified that, based on the documents circulated among Savage, Chrysler and the broker concerning the press, Savage *should have known* Chrysler intended to use the press as a specific purpose press, Savage *should have known* the dangers involved with the press, and Savage *should have* put adequate guards on the press. Des Jardins' opinion was not premised on any assumption that Savage had a duty to inquire as to Chrysler's intended use of the press.

Moreover, contrary to the opinion of the appellate court, Doser *did* produce evidence from which the jury could have concluded that Chrysler informed Savage of the use to which Chrysler originally intended to put the press. According to Des Jardins' testimony, the documents circulated among Savage, Chrysler and the broker specifically indicated that the press was to be used to press pivot bushings into the rear springs of automobiles. Based on this and the other information in the documents, Des Jardins concluded that Savage could have placed adequate guards on the press.

Savage points out that at the time of Doser's injury the press was performing a task different from the task for which it was purchased. When Doser was injured in 1979, the press was used to press bushings into the steering

mechanisms of automobiles. When Chrysler purchased the press in 1973, the documents circulated among Chrysler, Savage and the broker indicated, Chrysler intended to use the press to press bushings into the rear springs of automobiles. Savage contends these facts reveal that the press was multifunctional.

Savage also argues that even if it knew how Chrysler first intended to use the press in 1973, Doser presented no evidence to show Savage should have known or could have foreseen that Chrysler intended to use the press for a different purpose later. Savage contends it had no knowledge of Chrysler's subsequent uses of the press and these uses could have changed an unknown number of times since Chrysler purchased the press. Savage asserts that because the type of guard put on a press depends on the particular task the machine performs, and because Savage did not know of Chrysler's intended subsequent uses of the press, Savage could not have placed adequate guards on the press. Savage points out that during Chrysler's initial use of the press, the parts had to be side-loaded into the press, whereas with the second use, the parts had to be front-loaded into the press. Savage argues that the types of guards used on the press would differ depending on the way in which the press was loaded. Moreover, according to Savage, Doser offered no evidence of any specific guard Savage could have provided which would have been adequate for both uses of the press.

As the dissent from the appellate court opinion noted, Des Jardins acknowledged during cross-examination that Chrysler had used the press for two tasks, but Des Jardins refused to alter his opinion. Des Jardins continued to maintain that the press was a specific purpose machine, the press was unreasonably dangerous without guards, and Savage had enough knowledge of Chrysler's intended use of the press to provide adequate guards for it. As noted by the dissent, Des Jardins concluded that based on his expe-

rience in the industry, as well as the documents circulated among Savage, Chrysler and the broker, Savage should have known Chrysler intended to use the machine to press bushings. We also note that both tasks involved pressing bushings, so Chrysler's two uses of the press were not as dissimilar as Savage contends. Moreover, the dissent noted that Savage also knew the press required several ram dimensions to fit Chrysler's existing tooling which Chrysler intended to attach to the ram. Des Jardins determined, the dissent pointed out, that based on all of this information Savage could have provided guards on the press. From the evidence so produced, we conclude the jury could have reasonably determined that Savage should have known the intended use of the press and could have guarded it accordingly.

Des Jardins did testify during cross-examination that Savage would not have known solely from the purchase order how Chrysler intended to load or feed the parts into the press. Des Jardins also stated that when Chrysler used the press to press bushings into the rear springs of automobiles, Chrysler could have used one of three different types of springs. Des Jardins admitted that the only way Savage would have known the type of spring Chrysler intended to use was to ask Chrysler; that information was not apparent from the documents.

On redirect examination, however, Des Jardins explained his position that Savage should have known how Chrysler intended to use the press:

> "The purchase order as I stated before, we're talking about the diameter of the ram which is not standard. We're talking about the internal thread, which is not Savage's standard.
>
> Then they go on to say—to give a specific part that they're putting in the machine, this bushing, and this information *** is passed on only when you have specific tooling in mind, and that would have been conveyed as to how that

tooling was to be used, whether there was to be an automatic feeder, manual feeder, as in this case.

That's how these items are set into a purchase order by discussion between the engineers of the buyer and the engineers of the seller."

When asked about the rear spring during redirect examination, Des Jardins testified:

"I don't know until I see some drawings or parts themselves exactly what he's talking about R.R. right rear spring or R.R. spring.

Q. [Plaintiff's counsel]: As a manufacturer, say, in your job at Dreis and Krump would you have inquired into that?

A. Oh, yes. In fact, I would say there was no need to inquire because the contact between the salespeople and the customer's engineers, this all would have been discussed.

Commonly there is notes, often drawings, otherwise we have to request the drawings of the tooling and the piece part to make sure you conform.

When there is a specific tooling involved that usually comes up early in the discussion, and by the time they got to the engineering department, at any of the companies I worked for, it was—you had usually drawings, piece parts, pictures, you had a lot of information usually."

Des Jardins stated that the documents revealed Savage and Chrysler communicated regarding the specifications of the press, the changes to be made from the standard press, and the intended use of the press. Thus, the jury could have concluded that Savage had enough information to provide adequate guards for the press.

Savage contends Des Jardins' opinion lacked an evidentiary basis and, therefore, could not support the verdict. The weight accorded an expert's opinion must be measured by the facts supporting the opinion and the reasons given for his or her conclusions. (*St. Paul Fire & Marine Insurance Co. v. Michelin Tire Corp.* (1973), 12 Ill. App. 3d 165, 179; *Manion v. Brant Oil Co.* (1967), 85 Ill. App. 2d 129, 136; see *Yowell v. Hunter* (1949), 403 Ill. 202, 214.) If an

expert's opinion lacks a factual basis, the opinion deserves little weight. (*St. Paul*, 12 Ill. App. 3d at 179.) An expert's opinion cannot be based solely on guess, surmise or conjecture. See *Paul Harris Furniture Co. v. Morse* (1956), 10 Ill. 2d 28, 38.

Des Jardins' opinion that Savage knew Chrysler's intended purpose for the press, Savage alleges, had no basis in fact and therefore cannot be accorded any weight. Savage also disagrees with the grounds for many of Des Jardins' other opinions and conclusions. Savage, in its brief, details the discrepancies in Des Jardins' testimony, many of which we have already discussed. While Des Jardins' testimony was not flawless, we conclude it had a sufficient foundation to support the jury's verdict. Des Jardins based his opinion on the documents of Chrysler, Savage and the broker regarding the press, on the standards of guarding in the industry, and on his own extensive experience in the industry. Thus, Des Jardins' conclusions were grounded on more than mere surmise and conjecture.

We acknowledge that Barnett's testimony directly contradicted Des Jardins'. In this case, however, one expert simply disagreed with another expert. As we have indicated, the testimony of Doser's expert, if the jury believed him, was sufficient to support its verdict. It is the duty of the trier of fact, in this case the jury, to determine what expert and which testimony to believe. (*City of Monticello*, 414 Ill. at 557; *Turner*, 122 Ill. App. 3d at 425.) The jury has the obligation to resolve other factual issues as well. In this case, those issues included determining whether the press was multifunctional or unifunctional; the extent to which the multifunctional or unifunctional nature of the press affected Savage's ability to guard the press; whether Savage should have foreseen the uses to which Chrysler put the press (*Winnett*, 57 Ill. 2d at 13); and, of course, whether the press was unreasonably dangerous (*Winnett*, 57 Ill. 2d at 13). Considering the evidence as a whole, we

conclude the jury verdict was not against the manifest weight of the evidence. *Lawson*, 64 Ill. 2d at 553.

Savage also contends that because the press had a guard—the dual palm buttons—Savage fulfilled its duty and the press was not unreasonably dangerous. While Des Jardins testified that the palm buttons were sufficient alone to protect the operator of the press, he also stated that the buttons would not protect others around the press. Des Jardins based his opinion on his own experience and on guidelines set forth by the Occupational Safety and Health Administration. Without additional guards, Des Jardins concluded, the press was unreasonably dangerous.

Savage suggests that Doser ignored the safety device on the press. In other words, if Doser had not assisted Wilcox—which Doser admitted at trial he was not supposed to do—there would have been no need for additional guards on the press to protect Doser. Thus, Savage contends, Doser caused his accident and his injury. Part of Savage's argument depends upon how the accident occurred. Savage maintains Doser was injured because Wilcox pushed the palm buttons before Doser removed his hands from the press. Doser, however, contends his hands were out of the press when Wilcox activated it, but he then slipped and grabbed the press to prevent his fall, accidentally putting his hand under the ram. The testimony at trial revealed that many people walked past the press daily, thus indicating that anyone could slip, fall and come in contact with the press as Doser did.

We agree with Doser that no authority exists which states a manufacturer has to protect only the operator of a press. The issue for the jury's determination was whether the press was unreasonably dangerous. In deciding this issue, the jury also had to determine whether the accident or injury was reasonably foreseeable. (*Winnett*, 57 Ill. 2d at 12.) The liability of a manufacturer extends to those individuals to whom injury from an unreasonably dangerous

product may be reasonably foreseen. (*Winnett*, 57 Ill. 2d at 11.) The jury's decision did not rest on whether Savage installed a safety device on the press, or on whether Doser was the operator of the press or a bystander. Rather, the jury had to decide whether the press was unreasonably dangerous, whether Doser's accident was reasonably foreseeable, and whether the palm buttons were adequate to render the press not unreasonably dangerous. Moreover, it was the jury's duty to determine whether and to what extent Doser was responsible for his injuries. The jury apparently believed Doser's explanation of his accident because it returned a verdict in his favor. The jury, however, also decided Doser was at least in part responsible for his injuries because it reduced his award by 20%. Considering the testimony at trial, we cannot say the jury's verdict was against the manifest weight of the evidence.

Both parties cite numerous cases from Illinois and outside jurisdictions for support. We have reviewed these cases and find them distinguishable on their facts.

Additionally, we find it necessary to comment on the appellate court's application of *Rios* to the case at bar. In *Rios*, we held that "[a]lthough the multifunctional nature of a product [is] a factor to consider in determining whether a product is unreasonably dangerous, it [is] not necessarily *** decisive of that question." (*Rios*, 59 Ill. 2d at 86-87.) The appellate court in the case at bar asserted that this statement in *Rios* did not relieve Doser of "his burden to produce evidence that Savage's press, as a multifunctional product, was unreasonably dangerous." (184 Ill. App. 3d at 409.) The appellate court indicated further: "The record shows that plaintiff produced no evidence to establish how Savage's press, as a multifunctional machine, could have reasonably been fitted with safety guards at the point of operation." 184 Ill. App. 3d at 409-10.

In reaching this conclusion, the appellate court erroneously decided the press was a general purpose machine by dismissing the testimony of Doser's expert that the press was a specific purpose machine. The determination of whether the press was multifunctional or unifunctional, however, was a question of fact for the jury to resolve. The multifunctional character of the press, or lack thereof, was one factor the jury could consider in determining whether the press was unreasonably dangerous. A manufacturer cannot be relieved of its duty to make a reasonably safe machine because a reviewing court independently decides the machine is multifunctional. We conclude that "[e]vidence of the multifunctional nature of the machine was presented to the jury who resolved the issue of whether the press *** was unreasonably dangerous against defendant." (*Scott v. Dreis & Krump Manufacturing Co.* (1975), 26 Ill. App. 3d 971, 987.) A reviewing court should not substitute its judgment for that of the jury on a question of fact unless the jury's verdict is against the manifest weight of the evidence. In this case, we conclude the jury's verdict was not against the manifest weight of the evidence.

Doser contends the appellate court's holding conflicts with our *dicta* in *Rios*. Doser interprets the appellate court's opinion to stand for the proposition that a multifunctional machine without guards can never be unreasonably dangerous even if the manufacturer knew the intended use of the machine. If the appellate court's opinion is so interpreted, it does conflict with *Rios*. We agree with Savage, however, that the appellate court simply held that Doser did not fulfill his burden of proof because no expert testified that the press, as a multifunctional machine, was unreasonably dangerous. As we have already indicated, the appellate court's error was in first erroneously determining that the press was multifunctional. Nevertheless, to the extent the appellate court's opinion can be interpreted to con-

flict with *Rios*, we disagree with the appellate court and reaffirm our commitment to our position in *Rios*.

The appellate court also held that the press was not unreasonably dangerous because the warnings on the press were adequate. In view of our holding that the jury could have properly found the press unreasonably dangerous for lack of guards, we need not address the warning issue.

Finally, the issues raised by Savage concerning its claim against Chrysler were not addressed by the appellate court because the appellate court reversed the jury verdict. Because we are reinstating the verdict, those issues now must be addressed. We, however, decline Chrysler's request to consider those issues and, instead, remand this cause to the appellate court for determination of those issues. For the foregoing reasons, we reverse the judgment of the appellate court, affirm the judgment of the circuit court, and remand this cause to the appellate court for proceedings consistent with this opinion.

*Appellate court judgment reversed;*
*circuit court judgment affirmed;*
*cause remanded.*

JUSTICE MILLER, dissenting:

The majority characterizes the trial evidence as reflecting a factual disagreement between two expert witnesses, and therefore presenting a question that must be resolved by the trier of fact rather than by a court of review. (142 Ill. 2d at 190, 196-97.) Contrary to the majority's interpretation, however, there was no conflicting testimony on the matter that is essential to the resolution of the present appeal. Because the plaintiff failed to demonstrate that the hydraulic press was unreasonably dangerous for the task it was performing at the time of the plaintiff's accident, I would affirm the appellate court and enter judgment for the defendant.

To prevail on a claim sounding in strict liability, a plaintiff must prove that his injury resulted from a condition of the product, that the condition was unreasonably dangerous, and that it existed when the product left the manufacturer's control. (*Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 623.) Although a manufacturer has a nondelegable duty to produce a reasonably safe product (*Rios v. Niagara Machine & Tool Works* (1974), 59 Ill. 2d 79, 84-85), a manufacturer is not an absolute insurer of the safety of its products (*Suvada*, 32 Ill. 2d at 623). Upon review of the record in the present case, I would conclude that the plaintiff failed to show that the hydraulic press manufactured by the defendant was unreasonably dangerous.

The press was equipped with a number of safety features when it left the defendant manufacturer's control. The press was activated by dual palm buttons, which were spaced in such a way that an operator had to apply both hands to use the machine. In addition, guards located around the buttons prevented their accidental operation. The press was also equipped with an anti-tie-down feature, which prevented an operator from overriding one or both of the palm buttons, and an anti-repeat feature, which prevented the press from engaging in more than a single cycle without being reactivated by the operator. A warning on the front of the press advised operators not to place their hands in the area of the die, and the instruction manual warned against use of the press by more than one person at a time.

The plaintiff's employer, Chrysler Motors, originally used the press to install bushings in the rear springs of automobiles. At the time of the plaintiff's accident, however, the press was being used to lodge bearings in steering knuckles. As the press was first used, pieces were fed into the work area, or point of operation, from the side; as the press was used at the time of the plaintiff's accident, how-

ever, pieces were fed into the point of operation from the front.

As the majority opinion recognizes, the parties' experts agreed that the appropriateness of a particular safety device depends on the particular use made of a machine, and that a manufacturer's ability to equip a machine with suitable safety devices depends in large part on the manufacturer's knowledge of the intended function of the machine. (142 Ill. 2d at 190-91.) In their testimony at trial, both parties' experts stated that a manufacturer would not normally install barrier guards or sensing devices around the point of operation of a general purpose, or multifunctional, press, but that a manufacturer would do so on a press being built to perform a specific function.

Accordingly, the primary dispute at trial centered on the question whether the defendant knew of Chrysler's intended use of the machine. The plaintiff's expert witness, James Des Jardins, believed that the press was designed to meet a specific purpose. Des Jardins based his conclusion on an examination of the specifications furnished by Chrysler to the defendant at the time of manufacture. The defendant's expert witness, Ralph Barnett, disagreed with that assessment and concluded that the press was a general purpose machine. Barnett noted that the press was manufactured without a point of operation, and that Chrysler employed the press for different functions at different times.

To sustain the plaintiff's theory that the press was unreasonably dangerous because the defendant did not equip it with a protective barrier or sensor around the point of operation, the majority labors to establish that the defendant knew how Chrysler originally used the press. The relevant question in this appeal, however, is not whether the defendant manufacturer knew how the press was first used, but whether the defendant could have foreseen the use made of the press at the time of the plaintiff's acci-

dent, and could have equipped the machine with protective devices suitable for that particular task. At trial, the plaintiff attempted to establish only that the defendant was aware of Chrysler's first use of the press; the plaintiff failed to present testimony demonstrating that Chrysler's eventual use of the press was also foreseeable, and that the defendant could have equipped the press with additional protective guards suitable for that later function.

Although a manufacturer is not free to dispense with all safety devices simply because a product is intended to serve a variety of functions, the multifunctional nature of a product is a relevant consideration in determining what safety measures are appropriate, and whether the product is unreasonably dangerous. (*Rios v. Niagara Machine & Tool Works* (1974), 59 Ill. 2d 79, 86-87.) In the present case, the defendant manufacturer equipped the press with several all-purpose safety features and provided warnings concerning operation of the press. Chrysler's use of the press changed over time, however, and there was no evidence that the defendant manufacturer knew or should have foreseen the way in which the press was being used at the time of the plaintiff's accident. Nor was there any evidence that the defendant could have equipped the press with additional protective devices that would have prevented that occurrence. Viewing the evidence in the light most favorable to the plaintiff, I would conclude that judgment in favor of the defendant would be appropriate. (See *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510.) For that reason, I respectfully dissent.